Docket No. 79493–Agenda 5–November 1996.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHRISTOPHER THOMAS, Appellant.

Opinion filed September 18, 1997.

JUSTICE NICKELS delivered the opinion of the court:

After a jury trial in the circuit court of Lake County, defendant, Christopher Thomas, was convicted of murder arising from the shooting death of Rafael Gasgonia. Defendant waived a jury for his capital sentencing hearing. The trial judge found defendant eligible for the death penalty based upon the statutory aggravating factor that the murder occurred during the course of a felony. 720 ILCS 5/9–1(b)(6) (West 1994). After a hearing in aggravation and mitigation, the trial judge found that there were no mitigating factors sufficient to preclude imposition of the death penalty. The trial judge accordingly sentenced defendant to death. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). We affirm.

BACKGROUND

At about 8:30 p.m. on October 25, 1994, Rafael Gasgonia died after he was shot once in the forehead at close range. The shooting occurred outside the Olan Mills studio in Waukegan, where Gasgonia worked as a delivery driver. A police investigation resulted in the arrests of defendant, Ricky Powers and Leon Tyler. Defendant was tried separately from Powers and Tyler.

Prior to trial, defendant's attorneys sought to suppress statements defendant made implicating himself in the shooting death of Gasgonia. Defendant contended that his statements were the result of physical and psychological coercion and therefore involuntary. After a hearing, the trial judge denied the motion to suppress and the case proceeded to trial.

The State first presented the testimony of four witnesses who were at the Olan Mills studio at the time of the shooting. Adela Lopez testified that she was working at the studio about 8:15 p.m., when Gasgonia left the studio through the back door to smoke a cigarette. Gasgonia immediately returned and interrupted her while she was on the phone, complaining that someone had tampered with his car. As Lopez ended her phone call, Gasgonia again left the store out the back door. Shortly thereafter, the back door burst open and Lopez observed a black man with his arm around Gasgonia's neck pulling him outside. Others at the studio attempted to assist Gasgonia, but the door was pulled shut from the outside and they could not force the door open. Lopez testified she then called the police while others ran out the front door to assist Gasgonia. While she was on the phone, she heard one loud pop.

Zulma Rivera testified that she was working at the Olan Mills studio when the back door burst open and she observed Gasgonia in a struggle with a black man. After unsuccessfully attempting to open the back door with the other employees, Rivera followed another employee, Erik Daniels, out the front door and around to the back of the building. Rivera testified that she saw Gasgonia leaning against his car with his hands in the air. Rivera further testified that she observed one man on Gasgonia's left, holding him down against the car and another standing directly in front of Gasgonia holding a gun. Rivera then heard a pop and saw Gasgonia slump to the ground. Rivera then ran back into the studio. Rivera testified that she gave the police a general description of the assailants, but she was unable to identify them.

Erick Daniels testified that he was working at the Olan Mills store when he heard a bang at the back door and Gasgonia call for help. After trying to open the back door, Daniels exited through the front door and ran around to the back of the building. Daniels testified that he observed one man holding the back door, another standing next to Gasgonia, and a third pointing a gun at Gasgonia's head. Daniels heard a pop and ran back inside the studio until the police arrived.

Daniels further testified that shortly after the shooting, the police brought two suspects to the police car in which he was sitting. Daniels testified that one suspect was too big, but he believed the second suspect was the shooter. Daniels testified that he did not remember the assailant's face, but he made that identification based on the black and white striped shirt the suspect was wearing and because the suspect's body build matched the shooter.

Karen Santiago testified that she was working at the store when she heard noises and saw the commotion at the back door. After unsuccessfully trying to push open the back door with the other employees, she followed Daniels out the front door and around to the back of the building. In the back of the building, Santiago saw one man hold Gasgonia while another man shot him. Santiago could not identify the shooter, but described him as having a thin or medium build, curly hair and wearing a blue, black and white shirt.

The State also presented the testimony of Steve Gonyo, who worked at the Jewel store across from the Olan Mills studio. Gonyo testified that on the night of the shooting at about 8:15 p.m., he saw three people standing around a grey Oldsmobile as he unloaded milk crates behind the Jewel store. One person approached him and asked for a screwdriver. Gonyo testified that he recognized one of the three as Ricky Powers, a person he knew from high school. The State further linked the Oldsmobile to Ricky Powers through Marcus Jenkins, who testified that he sold that Oldsmobile to Powers about two weeks prior to the shooting.

Rhonda Powers, Ricky's fiancee at the time of the murder, was also called by the State. Rhonda testified that sometime after 9 p.m. on October 25, 1994, both defendant and Tyler arrived at her home out of breath and red in the face. Upon further questioning by the State, Rhonda denied that defendant made any statements to her. The State then impeached Rhonda with handwritten, typed and videotaped statements which she admitted to making just days after the murder. In those statements, Rhonda told the police that defendant told her that their car ran out of gas at the Olan Mills store behind the Jewel and that he had shot a man in the face.

Rhonda also testified that Ricky arrived home shortly after the defendant and Tyler. Rhonda testified that Ricky noticed she was upset and he became irritated. Rhonda further testified that Ricky had an argument with defendant, but she denied knowing the subject matter of the argument. The State then impeached Rhonda with her prior statements in which she told the police that the reason Ricky was upset with defendant was because defendant told her about the shooting. The trial judge then gave a limiting instruction concerning the use of Rhonda's prior statement regarding what her husband said, which the defendant challenges on appeal.

On cross-examination, Rhonda claimed that the statements she made to the police were lies. Rhonda claimed that she told the police that defendant made those statements because she was angry with the defendant and wished to frame him for the murder. Additional facts concerning the use of Rhonda's prior inconsistent statements at trial will be provided as necessary to address defendant's challenges on appeal.

The State also presented the testimony of Detective James McCarthy, who identified photographs of the crime scene. The photographs showed Gasgonia lying next to his car with his wallet next to his chin. The photographs also depicted a light blue and grey Oldsmobile parked close to Gasgonia's car. Detective McCarthy described a search he conducted of the Oldsmobile and identified a cellular phone and radar detector he discovered in the trunk. Another witness testified that those items belonged to Gasgonia.

Delanda Ewing testified that she was with her boyfriend at about 8:30 p.m. on October 24, 1994, when he received a page. Her boyfriend returned the page and they both drove to a laundromat near the Jewel store and picked up Ricky, who was carrying a gas can. Ewing and her boyfriend then took Ricky to his home, where they found defendant and Tyler. Defendant, Tyler and Ricky then left with Ewing and her boyfriend. Ewing testified that during the drive defendant stated that “he smoked that mog” and that he threw the gun near Cinnamon Lake Towers.

Detective Kerkorian testified about obtaining statements from the defendant. Detective Kerkorian testified that he gave defendant his 
Miranda
 warnings and obtained a waiver of those rights. Defendant then gave an oral statement and also prepared a handwritten statement. Defendant also subsequently signed a typewritten statement that the police prepared from his oral statement. After obtaining the handwritten and typed statements, Detective Kerkorian and another officer also videotaped defendant identifying those statements.

Detective Kerkorian then read the typed statement to the jury. Defendant's statement provides that Ricky Powers and Tyler picked him up in a blue Oldsmobile. The three were cruising around when the car ran out of gas near the Jewel store. They attempted to get a screwdriver to steal another car, but they could not get one at Jewel. They walked around Jewel and discovered an unlocked red car near the Olan Mills studio. Tyler opened the door to the red car and removed a phone and they took it back to the Oldsmobile, placing it in the trunk. The three then returned to the red car and Thomas took the cord for the phone.

At the car, Tyler came up with a plan to rob someone and they hid in some nearby bushes waiting for a victim. At this time, a man came out of the Olan Mills store and walked to the red car. The man returned to the store, and then came out again. The man confronted defendant and demanded the return of his belongings. Tyler then jumped out of the bushes and grabbed the man as Ricky pulled the door to the Olan Mills store closed from the outside. Tyler pushed the man against his car and demanded money. The man gave Tyler the cash out of his wallet and Tyler handed it to defendant.

Defendant's statement then provides that he pulled a gun out in an effort to scare the man into giving more money, but the gun went off and they all ran. Ricky stayed by Jewel, but defendant and Tyler ran to Ricky's home, where they found Rhonda. Ricky arrived there a short time later, having been driven from Jewel to his home by Delanda Ewing and her boyfriend. Defendant later retrieved the gun from where he threw it after the shooting and sold it for $100.

The jury was instructed on involuntary manslaughter and first degree murder. The jury returned guilty verdicts on four counts of first degree murder, including felony murder based on the predicate offenses of burglary and robbery. Defendant waived his right to be sentenced by a jury at the capital sentencing hearing. The trial judge found defendant eligible for the death penalty because the murder occurred during the course of a felony and defendant was over 18 years of age when the murder was committed.

The defendant's capital sentencing hearing then proceeded to a hearing in aggravation and mitigation. In aggravation, the State first presented evidence from defendant's juvenile court records. Defendant's juvenile records contained evidence that he stole items from a Salvation Army drop box and took a purse from inside a school bus. The State also presented evidence from his juvenile records that when he was 15 years old he attacked and fondled a 13-year-old girl and took a chain off another girl's neck. The State also presented evidence that defendant had pleaded guilty to aggravated discharge of a firearm and possession of a stolen vehicle.

The State also presented affidavit evidence from several psychiatrists. In these affidavits, the psychiatrists concluded that defendant had an antisocial personality disorder. Several probation officers and corrections officials testified that defendant did not cooperate with his past sentences of probation and that he was disruptive and combative while in jail.

 In mitigation, the defense first presented the testimony of Derrick Bankston, who worked in the juvenile probation division of Lake County. Bankston testified that he observed defendant during his detention and that he was likable and nonviolent, but had trouble staying focused in school and during work. Bankston further testified that defendant's mother was incarcerated during his detention in Lake County and that defendant lived in a very poor section of Chicago.

Defendant's mother, Martese Thomas, also testified in mitigation. Martese testified that she was 15 years old when defendant was born and shortly after his birth she began to use heroin. Martese also testified that defendant usually stayed with relatives during his youth because she was unable to take care of him. Defendant's father did not care for or support him.

Against the advice of his attorneys, defendant also testified during the mitigation phase of his capital sentencing hearing. Defendant testified that his statements to police were false and that he did not commit the murder. Defendant also asked the judge to spare his life.

After closing arguments, the trial judge found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial judge sentenced defendant to death for the murder of Gasgonia. Defendant's post-trial and post-sentencing motions were denied. Defendant now appeals from his conviction and sentence.

ISSUES

Defendant raises several challenges to his conviction for the murder of Gasgonia. Defendant first argues the State failed to prove him guilty beyond a reasonable doubt. Defendant also raises three challenges to the State's use of Rhonda Powers' prior inconsistent statements at his trial. Defendant argues that: (1) the trial court erred in admitting as substantive evidence Rhonda's prior inconsistent statement that defendant confessed to the murder; (2) the trial court violated defendant's right under the sixth amendment to confront witnesses where it allowed the State to impeach Rhonda's trial testimony with her prior statements concerning what her husband, a nontestifying codefendant, said to the defendant after the murder; and (3) this impeachment of Rhonda was further improper because her husband's statements were collateral and not impeaching of Rhonda's in-court testimony.

Defendant also challenges his death sentence. Defendant first raises three challenges to the introduction of evidence at his sentencing hearing that he suffers from an antisocial personality disorder. Defendant argues that: (1) the trial court violated the eighth amendment in considering defendant's antisocial personality disorder as aggravating evidence; (2) he was denied the right to cross-examine witnesses at his sentencing hearing where psychiatric evidence was presented solely by affidavit; and (3) his trial counsel was ineffective for failing to present expert testimony to counter the State's affidavits claiming defendant had an antisocial personality disorder.

Defendant also argues that he should be given a new sentencing hearing because: (1) the trial court erred in sentencing him to death in light of the significant mitigation evidence presented; (2) the trial court erroneously considered in aggravation that the murder occurred during the course of a burglary, where the burglary was over by the time of the murder; (3) the trial court erred in excluding evidence that a codefendant did not receive the death penalty; and (4) the Illinois death penalty statute is unconstitutional.

ANALYSIS

Trial Issues

Reasonable Doubt

Defendant first contends that his conviction for murder should be reversed because the State failed to prove him guilty beyond a reasonable doubt. Defendant notes that the occurrence witnesses gave conflicting descriptions of the shooter and none identified defendant in court. Rivera described the shooter as a dark-complected 18- or 19-year-old black male about 5 feet 8 inches tall with a medium build. Santiago described the shooter as light-skinned, with a thin or medium build and short curly hair. Daniels testified that when he observed the shooting the lighting was poor and he focused mostly on the gun, but described the shooter as between 5 feet 6 inches and 6 feet tall and weighing between 180 and 200 pounds. Gonyo was unable to identify defendant as one of the two individuals he saw with Ricky Powers behind Jewel.

 Defendant also notes that both Daniels and Santiago apparently made misidentifications. Daniels testified that the police brought him a suspect shortly after the shooting who he was 99% sure was the shooter. However, Daniels also testified that this identification was based only on that person's clothing and body build. In addition, Santiago testified that she identified a person from a police photo array who “looked just like” the shooter, but she was not sure if it was him.

Defendant also challenges the testimony of Rhonda Powers and Delanda Ewing. Defendant argues that Rhonda's prior inconsistent statement that defendant confessed to the shooting is inadmissible. In addition, Delanda Ewing's testimony should not be believed because she did not want to be cross-examined and because her original statement to police did not contain the defendant's statement that he “smoked that mog.”

Last, defendant also seeks to discount the statements he gave to police. Defendant claims that he was afraid at the time of the questioning and merely admitted to accidently shooting Gasgonia as a means of obtaining his freedom. Defendant also contends that it is suspicious that the police did not videotape him making his statement, but did videotape him acknowledging the typed and handwritten statements.

In reviewing the sufficiency of evidence to sustain a verdict on appeal, this court applies the standard of review set forth by the United States Supreme Court in 
Jackson v. Virginia
, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). See 
People v. Campbell
, 146 Ill. 2d 363, 374 (1992); 
People v. Collins
, 106 Ill. 2d 237, 261 (1985). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, 
any
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” 
Jackson
, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789. Under this standard, a reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses. 
People v. Young
, 128 Ill. 2d 1, 51 (1989). This same standard applies regardless of whether the evidence is direct or circumstantial. 
Campbell
, 146 Ill. 2d at 374.

Applying this standard, we must reject defendant's claim that he was not proven guilty beyond a reasonable doubt. That the occurrence witnesses gave conflicting descriptions of the shooter is not fatal to the State's ability to prove that defendant committed the murder. In reviewing the evidence in favor of the State, a rational jury could have believed defendant's own statement that he shot Gasgonia. The jury was also entitled to believe Ewing's testimony that defendant stated that he “smoked that mog” shortly after the murder.

In addition to defendant's statements, other evidence also links defendant to the crime. Rhonda Powers testified that Ricky was with Tyler and defendant in an Oldsmobile on the night of the murder, but Tyler and defendant returned to her home without Ricky or the car. Gonyo testified that, shortly before the shooting, he saw Ricky and two other men standing next to an Oldsmobile behind Jewel. Eyewitnesses to the shooting testified that three individuals were involved in the attack on Gasgonia.

Even excluding defendant's statements to Rhonda Powers, Rhonda's testimony that defendant and Tyler arrived at her house shortly after the killing red-faced and out of breath supports the inference that they had recently fled the scene of the crime. In addition, after Ricky arrived back at his house, defendant and Tyler then left with him. Gasgonia's property was later recovered in the Oldsmobile found at the scene. Given all this evidence and all reasonable inferences therefrom, a reasonable trier of fact could have determined that defendant committed the murder of Gasgonia beyond a reasonable doubt.

Rhonda Powers' Testimony

A.

Defendant raises several errors related to the testimony of Rhonda Powers. Upon questioning by the State, Rhonda testified that defendant and Tyler arrived at her home the night of the shooting red-faced and out of breath. Rhonda admitted that she asked the defendant what happened, but denied that defendant made any response. She then admitted telling the police prior to trial that defendant answered that he shot someone in the face near the Olan Mills studio, but claimed that statement was not true. The State impeached Rhonda with her prior handwritten, typed and videotaped statements, which the trial court admitted as substantive evidence pursuant to section 115–10.1(c)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10.1(c)(2) (West 1994)).

Defendant first contends that the trial court erred in admitting Rhonda's prior statement containing defendant's admission that he shot someone. Section 115–10.1 provides for the admission of prior inconsistent statements as substantive evidence where certain prerequisites are satisfied and the statement “narrates, describes, or explains an event or condition of which the witness has personal knowledge.” 725 ILCS 5/115–10.1(c)(2) (West 1994). Defendant concedes that all other prerequisites for admission were satisfied, but argues that Rhonda lacked the required “personal knowledge.”

 Defendant relies upon several appellate court cases which have held that “the personal knowledge required by the statute is not that which is acquired by being told something, even if an admission; rather, it means `the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement.' ” 
People v. Cooper
, 188 Ill. App. 3d 971, 973 (1989), quoting R. Steigmann, 
Prior Inconsistent Statements as Substantive Evidence in Illinois
, 72 Ill. B.J. 638, 640 (1984); see also 
People v. Coleman
, 187 Ill. App. 3d 541, 547 (1989); 
People v. Saunders
, 220 Ill. App. 3d 647, 658 (1991); 
People v. Hastings
, 161 Ill. App. 3d 714, 720 (1987). As Rhonda did not have personal knowledge of the murder of Gasgonia, defendant argues that her prior inconsistent statement that defendant admitted to committing that murder is not admissible as substantive evidence.

The State responds that any error is waived. We agree. When the trial judge agreed to admit the handwritten, typed, and videotaped statements as substantive evidence, defendant's attorney voiced only a general objection. Defendant's attorney did not advance the argument that Rhonda lacked the requisite personal knowledge and the trial judge had no opportunity to rule on that issue. Moreover, defendant did not include this argument in his post-trial motion and he did not argue this point at the hearing on that motion. Defendant's failure to raise this issue below results in waiver on appeal. 
People v. Enoch
, 122 Ill. 2d 176, 190-91 (1988); 
People v. Pastorino
, 91 Ill. 2d 178, 192 (1982) (finding that a general objection to the use of a prior inconsistent statement waives the issue for appeal).

In his reply brief, defendant requests review of this issue under the plain error doctrine. 134 Ill. 2d R. 615(a). The plain error doctrine is a limited exception to the waiver rule. 
People v. Herrett
, 137 Ill. 2d 195, 209 (1990). “The doctrine of plain error is applied to remedy errors so plain and prejudicial that failure to object to them is not a waiver for purposes of appeal.” 
People v. Davis
, 145 Ill. 2d 240, 251 (1991). A reviewing court will examine an issue not properly preserved under the plain error doctrine where the evidence is closely balanced or the alleged error is so fundamental that it denies the defendant a fair trial. 
People v. Byron
, 164 Ill. 2d 279, 293 (1995).

The evidence in defendant's trial was not closely balanced. Defendant's confession was consistent with all the evidence presented at his trial. This evidence included Rhonda's testifying that Ricky, Tyler and defendant were together on the night of the shooting. Gonyo testified that he saw Ricky Powers and two other people near a blue-grey Oldsmobile at the scene of the crime. The occurrence witnesses testified that three men attacked Gasgonia and one shot him in the face from close range. Even excluding any statements defendant made to Rhonda, her prior statements describing defendant and Tyler arriving at her home shortly after the murders red-faced and out of breath were admissible as substantive evidence. In addition, Rhonda's prior statement that Ricky arrived a short time later and argued with defendant was also admissible as substantive evidence. These facts combined with Delanda Ewing's testimony that defendant stated that he “smoked that mog” strongly corroborate defendant's confession. When viewed as a whole, the evidence of defendant's guilt is overwhelming.

Moreover, the introduction of defendant's admission through Rhonda's prior inconsistent statement, if error, did not deprive defendant of a fair trial. Even redacting defendant's admissions from Rhonda's prior statement, the other portions of Rhonda's statement strongly corroborated defendant's participation in the murder. Given this fact and all the evidence presented at defendant's trial including defendant's confessions, any error in admitting defendant's admission would be harmless beyond a reasonable doubt. Thus, we find defendant's claim waived.

B.

Defendant next contends that his sixth amendment right to cross-examine and confront witnesses was violated by the State's impeachment of Rhonda Powers. Rhonda testified that Ricky arrived at her home a short time after defendant and Tyler. She further testified that Ricky and defendant had an argument, but she denied knowing what the argument was about. At this time, the State impeached Rhonda with her prior statements to police in which she stated that Ricky became upset because defendant told her about the murder:

“Q. Did Ricky express any anger or aggravation toward the defendant at this point?

A. Not really, they had an argument about something, but I'm not sure what it was.

Q. Well, didn't you tell Detective McCarthy that Ricky got upset with [defendant] for getting you involved, or for telling you what had happened?

A. Yes, I said that.

Q. That's in the typed statement that you signed.

A. Yes.

Q. And in your handwritten statement, you wrote `Ricky got upset with [defendant] and said, `Man, she's been through too much already.' And then you wrote in parenthesis, `because I told Ricky what [defendant] said,' close parentheses. `You shouldn't have told her nothing like that–' ”

The defense objected to this impeachment. After a sidebar conference, the trial judge gave a limiting instruction concerning Rhonda's testimony:

“THE COURT: All right. Ladies and gentleman I'm instructing you that as to the alleged statements of [Ricky] Powers that is being gone into here, you are not to consider the statement which is a hearsay statement for its truthfulness of what was said; you are merely to consider that statement in connection with the possible impeachment that is carried out at this time, or allegedly is carried out at this time. 
But you are to consider that statement of [Ricky] Powers as being truthful, or being establishing, or establishing the truthfulness of that statement.”

Defendant argues that the trial judge's admonishment was confusing and insufficient to prevent the admission of Rhonda Powers' statements as substantive evidence. Defendant also contends that the impeachment of Rhonda Powers, which related an inculpatory statement made by a nontestifying codefendant, violated his right to confrontation under 
Bruton v. United States
, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), and progeny.

We need not determine whether the trial judge's instruction was sufficient to limit Rhonda's statement for its impeachment value because Rhonda's statement was admissible as substantive evidence. The admission of Ricky's statement through Rhonda's prior inconsistent statement presents a hearsay within hearsay problem. The first hearsay statement is the statement made by Ricky to defendant, which was overheard by Rhonda. Although Ricky's statement is not technically being introduced for the purpose of its truth, it is still hearsay because its purpose is to prove the implicit assertion that defendant told Rhonda about the murder. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 565 (5th ed. 1990). The second hearsay statement is the out-of-court statement Rhonda made to the police. Both statements, however, come under exceptions to the rule excluding hearsay.

Ricky's statement to the defendant is admissible under the coconspirator exception to the hearsay rule. Under this exception, the statement of one coconspirator is admissible against the others where the statement is made during the course of and in furtherance of the conspiracy. 
People v. Davis
, 46 Ill. 2d 554 (1970). Although Ricky's statements occurred after the completion of the robbery and murder, the statements constituted an attempt at concealment. Our appellate court has repeatedly held that the course of a conspiracy includes subsequent attempts at concealment of the crime where sufficiently proximate in time to the offense. 
People v. Columbo
, 118 Ill. App. 3d 882, 948 (1983); 
People v. Meagher
, 70 Ill. App. 3d 597, 603 (1979); 
People v. McInnis
, 88 Ill. App. 3d 555, 566 (1980); 
People v. Eddington
, 129 Ill. App. 3d 745, 773 (1984); see also 
People v. Parmly
, 117 Ill. 2d 386, 393 (1987) (assuming, but not deciding, that conspiracy includes subsequent efforts at concealment). Ricky's statement to defendant occurred immediately after the murder and expressed the desire to conceal the matter and prevent his wife's involvement. In addition, the statement was made prior to defendant's retrieving and disposing of the gun. Therefore, the statement was admissible against defendant as a coconspirator's statement.

Ricky's statement to defendant also qualifies as an excited utterance. A statement related to a startling event made while the declarant was under the stress of excitement caused by the event is admissible despite its hearsay nature on the theory that the declarant lacks an opportunity to fabricate. 
People v. Damen
, 28 Ill. 2d 464, 471 (1963). Here, Ricky's statements to defendant came in response to the startling event of discovering that defendant told his wife about the murder. In addition, Ricky's statements were related to that event and uttered without time to fabricate. Thus, Ricky's statements were also admissible as an excited utterance.

Rhonda's prior inconsistent statement to police was also admissible despite its hearsay nature. As stated, section 115–10.1 provides for the admission at trial of prior inconsistent hearsay statements where the signed statement “narrates, describes, or explains an event or condition of which the witness ha[s] personal knowledge.” 725 ILCS 5/115–10.1(c)(2) (West 1994). Assuming but not deciding that the personal knowledge required under the statute must be from observing the event, Rhonda witnessed the argument between defendant and Ricky and her statement described and narrated that event. Thus, Rhonda's prior inconsistent hearsay statement was admissible under the statute. As both Ricky's and Rhonda's statements come under exceptions to the rule excluding hearsay, the trial judge did not need to give the limiting instruction on the use of Rhonda Powers' statement.

The use of Rhonda's statement as substantive evidence at defendant's trial did not deny defendant his constitutional right to confront witnesses. First, Rhonda took the stand and testified that she made the prior out-of-court statement to the police. Where a hearsay declarant testifies at trial, the right to confrontation is satisfied. 
California v. Green
, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935 (1970). In addition, Ricky's statements to defendant overheard by Rhonda and contained in her statement were admissible under the coconspirator exception to the hearsay rule. In 
Bourjaily v. United States
, 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987), the Supreme Court held that the confrontation clause is not violated by the introduction of hearsay statements under the “firmly rooted” coconspirator exception to the hearsay rule. See also 
United States v. Inadi
, 475 U.S. 387, 394-400, 89 L. Ed. 2d 390, 398-402, 106 S. Ct. 1121, 1125-29 (1986) (finding that confrontation clause does not require unavailability for admission of coconspirator's statement).

Moreover, the fact that our hearsay exception for coconspirator's statements is slightly broader than the federal rule at issue in 
Bourjaily
 does not present a confrontation problem. Even where there is no “firmly rooted” hearsay exception, the confrontation clause is not violated where the statement is not inherently devastating, or where there are other sufficient indicia of reliability supporting the truth of the statement. In 
Dutton v. Evans
, 400 U.S. 74, 77, 27 L. Ed. 2d 213, 220, 91 S. Ct. 210, 214 (1970), a nontestifying codefendant told a fellow prisoner “[i]f it hadn't been for that dirty son-of-a-bitch [codefendant], we wouldn't be in this now.” The fellow prisoner testified to the statement at trial under a Georgia rule that provided for the admission of all statements by codefendants, even those made after arrest, as long as a conspiracy to conceal the crime continues.

The Supreme Court found no confrontation violation in the introduction of the codefendant's statement. The Supreme Court first distinguished 
Dutton
 from the 
Bruton
 line of cases because the statement at issue did not constitute the use of a “devastating” confession which originated from custodial interrogation and which was introduced in the context of a joint trial. 
Dutton
, 400 U.S. at 87, 27 L. Ed. 2d at 226, 91 S. Ct. at 219. The Court then noted that there is no confrontation problem with proving that a particular statement was made by someone who does not testify:

“The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.” 
Dutton
, 400 U.S. at 88, 27 L. Ed. 2d at 226, 91 S. Ct. at 219.

The Court further reasoned that on the issue of the inculpatory nature of the out-of-court statement, there was no confrontation problem because the statement did not carry any express factual assertion of defendant's guilt, but only an inference of guilt. 
Dutton
, 400 U.S. at 88, 27 L. Ed. 2d at 227, 91 S. Ct. at 219. In addition, the Court noted that the statement by the nontestifying codefendant was spontaneous and against penal interest, which are additional indicia of reliability. 
Dutton
, 400 U.S. at 89, 27 L. Ed. 2d at 227, 91 S. Ct. at 219-20; see also 
White v. Illinois
, 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992) (finding that that an excited utterance is a “firmly rooted” hearsay exception which does not offend the confrontation clause). The Court also noted that defendant was free to call the nontestifying codefendant as a witness if he wished to challenge his statement. 
Dutton
, 400 U.S. at 88 n.19, 27 L. Ed. 2d at 226 n.19, 91 S. Ct. at 219 n.19.

Defendant's right to confront witnesses was similarly not violated by the introduction of Ricky's statements into evidence. Unlike 
Bruton
, on which defendant relies, there was no introduction of a custodial confession at a joint trial. The statement was also admissible under the coconspirator exception to the hearsay rule and it did not contain any express factual assertion of defendant's guilt. Moreover, Ricky's statement was spontaneous, against his penal interest, and generally made under circumstances which indicate the statement was reliable. Last, we also note that defendant was free to call Ricky as a witness. We therefore find no violation of defendant's constitutional right to cross-examine and confront witnesses.

C.

Defendant argues that because Ricky's statement was inadmissible under the confrontation clause, the impeachment of Rhonda was on a collateral matter and therefore improper. We have determined that the statement was admissible as substantive evidence. Therefore, we need not further consider defendant's argument that the impeachment was improper.

Sentencing Issues

Antisocial Personality Disorder Evidence

 At his sentencing hearing, the State introduced an affidavit from Dr. Nageswararao Vallabhaneni, who is a psychiatrist at the Department of Corrections. The affidavit provided:

“I diagnosed [defendant] with Antisocial Personality Disorder which is defined by the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) (American Psychiatric Association) as a `pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood.' ”

The State also introduced affidavits from Dr. Barbara Drill and Dr. John Garlick, who both examined defendant and prepared reports while he was a juvenile. Dr. Drill concluded in her affidavit that defendant showed “personality characteristics and behaviors typical of antisocial sociopathy” and predicted that his criminal behavior would likely recur without successful treatment. In sentencing the defendant to death, the trial judge noted Dr. Vallabhaneni's diagnosis and defendant's history of antisocial behavior.

A.

Defendant raises three related challenges to the introduction of this evidence at his sentencing hearing. Defendant first argues that the trial court violated eighth amendment principles in considering defendant's antisocial personality disorder as aggravating evidence. Defendant notes that the disorder is the result of the poor upbringing he received and also has a genetic component. Defendant contends that because antisocial personality disorder is a mental illness that developed through no fault of his own, it cannot be considered as aggravating evidence.

Defendant's claim is without merit. The eighth amendment, applicable to the states as a principle of due process, demands an individualized assessment of the appropriateness of the death penalty based on the character of the defendant and the circumstances of the crime. 
Woodson v. North Carolina
, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976) (opinion of Stewart, J., joined by Powell and Stevens, JJ.). The eighth amendment further requires that a sentencer “not be precluded from considering, 
as a mitigating factor
, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” (Emphasis in original.) 
Lockett v. Ohio
, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65 (1978). What the eighth amendment does not require is that a sentencer consider evidence solely as mitigating.

The United States Supreme Court has recognized that evidence of mental problems or poor upbringing may have both aggravating and mitigating components. 
Penry v. Lynaugh
, 492 U.S. 302, 324, 106 L. Ed. 2d 256, 281, 109 S. Ct. 2934, 2949 (1989) (“[M]ental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future”); see also 
Burger v. Kemp
, 483 U.S. 776, 793-94, 97 L. Ed. 2d 638, 656-57, 107 S. Ct. 3114, 3125-26 (1987) (finding that defense counsel did not act ineffectively in failing to introduce evidence of defendant's troubled background during a sentencing hearing because such evidence may have been considered aggravating). Thus, although the eighth amendment entitles a defendant to submit evidence concerning his background that he considers mitigating, it does not require that the sentencer give evidence only mitigating weight.

This court has also rejected defendant's underlying contention that because his upbringing and personality disorder were not his fault, it cannot be considered as aggravating. In 
People v. 
Henderson
, 142 Ill. 2d 258, 338 (1990), defendant made a similar argument that his upbringing caused his violent nature and therefore his violent nature was “simply not his fault and can't be considered a reason to impose the death penalty upon him.” This court rejected that contention, finding that such evidence is not inherently mitigating because it also indicates an “unrehabilitable violent nature.” 
Henderson
, 142 Ill. 2d at 340. Thus, we conclude that the trial judge did not violate the eighth amendment in considering defendant's antisocial personality disorder and antisocial behavior as aggravating evidence.

B.

Defendant next contends that the trial court erred in admitting the psychiatric evidence solely in affidavit form because it deprived the defendant of the opportunity for cross- examination. In support of his argument, defendant relies upon statements regarding the benefits of cross-examination made in two United States Supreme Court opinions, 
Barefoot v. Estelle
, 463 U.S. 880, 77 L. Ed. 2d 1090, 103 S. Ct. 3383 (1983), and 
Ford v. Wainwright
, 477 U.S. 399, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986).

In 
Barefoot v. Estelle
, the defendant argued that psychological evidence concerning future dangerousness was so unreliable that its use at a capital sentencing hearing violates the eighth amendment. The Supreme Court rejected that argument and noted that such evidence may be admitted with its weight left to the fact finder. 
Barefoot
, 463 U.S. at 902, 77 L. Ed. 2d at 1110, 103 S. Ct. at 3399. The Court reasoned that the adversary process, through cross-examination and the introduction of contrary evidence, could be trusted to “sort out the reliable from the unreliable.” 
Barefoot
, 463 U.S. at 901, 77 L. Ed. 2d at 1109, 103 S. Ct. at 3399.

In 
Ford v. Wainwright
, the defendant challenged Florida's procedure for determining whether a condemned prisoner is competent to be executed. Under the procedure at issue, the Governor appointed three psychiatrists to examine the defendant and report back on his sanity. The defendant's attorneys were not permitted to participate in the examination or to submit any other materials to the Governor on the issue of defendant's competence. A plurality of the Supreme Court concluded that this procedure was inadequate because it did not allow the defendant the opportunity to submit relevant evidence on his behalf and because it did not permit him to challenge the experts' opinions by cross-examination or other means. 
Ford
, 477 U.S. at 415, 91 L. Ed. 2d at 350, 106 S. Ct. at 2604.

From these cases, defendant attempts to cull the principle that psychiatric evidence may not be admitted in affidavit form. Defendant argues that the submission of this type of evidence in affidavit form leaves damaging evidence unchallengeable and denies necessary cross-examination. Without cross-examination, defendant argues, he could not challenge the reliability of the doctors' conclusions prior to admission of the evidence. Without cross-examination, the defendant also argues, he could not bring to the court's attention the mitigating elements of the diagnosis, such as the fact that antisocial personality disorder abates when a person reaches middle age. Defendant therefore contends that the introduction of psychiatric evidence in affidavit form deprived him of a fair sentencing hearing.

The United States Supreme Court has recognized that a court may conduct a sentencing inquiry broad in scope and largely unlimited as to the kind of information that can be considered. 
Roberts v. United States
, 445 U.S. 552, 556, 63 L. Ed. 2d 622, 628, 100 S. Ct. 1358, 1362 (1980). Section 9–1(e) of the Criminal Code of 1961 governs the admissibility of evidence during a death penalty hearing. 720 ILCS 5/9–1(e) (West 1994). This court has held that hearsay evidence, such as the affidavits here, may be admitted without cross-examination where relevant and reliable:

“Section 9–1(e) of our death penalty statute allows the introduction of evidence during the sentencing hearing that would not ordinarily be admissible during the guilt phase of a trial. [Citations.] The factors controlling the admissibility of evidence at a capital sentencing hearing are relevance and reliability, and the determination of admissibility rests in the discretion of the trial court. [Citations.] Hearsay testimony will not 
per se
 be deemed to be inadmissible at a sentencing hearing as denying a defendant's right to confront witnesses.” 
People v. Hall
, 114 Ill. 2d 376, 416-17 (1986).

The trial court did not abuse its discretion in finding the affidavit evidence relevant and reliable. The affidavit evidence was relevant to defendant's character and background. In addition, the affidavits were reliable opinion evidence from trained experts who diagnosed defendant based on their professional experience. Thus, we find no abuse of discretion in the trial court's admission of the affidavit evidence at defendant's sentencing hearing.

At best, the cases cited by defendant stand for the proposition that a defendant must be given some opportunity to challenge psychiatric evidence. However, defendant was not in any way prevented from contesting the conclusions contained in the affidavits during the sentencing hearing. Defendant was free to challenge the affiants' conclusions by calling them as witnesses and cross-examining their diagnoses, or by presenting contrary expert testimony. Moreover, nothing prevented defendant from submitting any evidence concerning the mitigating elements of this disorder, such as that it abates when a person reaches a certain age.

Finally, it should be noted that defendant did not challenge the diagnosis that he suffered from an antisocial personality disorder. In fact, defendant relied upon the diagnosis as mitigating evidence during his sentencing hearing and further argues in this court that such evidence makes the death penalty inappropriate in his case. We therefore find that the introduction of the affidavit evidence did not deprive defendant of a fair sentencing hearing.

C.

Defendant's third argument relating to the introduction of the affidavit evidence is that his counsel was ineffective for failing to counter the State's affidavits. Defendant contends that his counsel should have either presented contrary expert opinion or called the State's affiants as witnesses. Defendant reasons that by doing so his trial counsel could have challenged the diagnosis or showed that the antisocial behavior would abate as defendant aged.

Whether a defendant received ineffective assistance of counsel is governed by the two-part test articulated in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), which this court adopted in 
People v. Albanese
, 104 Ill. 2d 504, 526 (1984):

“A convicted defendant's claim that counsel's assistance was so defective as to require reversal of his conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.” 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

In the context of a capital sentencing hearing, prejudice is shown where there is “a reasonable probability that, but for counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” 
People v. Brisbon
, 164 Ill. 2d 236, 246 (1995).

Defendant cannot show that his counsel's conduct was deficient, and therefore he cannot satisfy the first prong of an ineffective-assistance-of-counsel claim. Our review of counsel's conduct contains a strong presumption that the conduct “falls within the wide range of reasonable professional assistance.” 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. Defendant's attorney could not both challenge the affiants' diagnoses that defendant suffered from antisocial personality disorder and also rely on that fact as mitigating evidence. Furthermore, defense counsel may have made a strategic decision not to call additional expert witnesses because he did not wish to highlight through live testimony the State's evidence concerning defendant's mental problems and resultant criminal history. We therefore conclude that defendant did not suffer ineffective assistance of counsel where his attorney failed to challenge or otherwise supplement the affidavit evidence concerning defendant's personality disorder.

Appropriateness of Death Penalty

Defendant next contends that his death penalty should be reversed in light of the mitigation evidence presented at his sentencing hearing. Defendant argues that the mitigating evidence admitted below shows that he is a youthful offender whose criminal behavior can be traced to an upbringing without supervision or role models. Defendant further argues that his behavior would improve as he grows older in the structured environment of prison. Thus, defendant requests that this court vacate his death sentence and remand the cause so that the trial court could impose a sentence other than death.

A sentencing decision by the trial court will generally not be disturbed on appeal unless the trial court abuses its discretion. 
People v. Blackwell
, 171 Ill. 2d 338, 360 (1996); 
People v. Gonzalez
, 151 Ill. 2d 79, 89 (1992). However, this court has recognized the “qualitative difference between death and imprisonment as penalties.” 
People v. Gleckler
, 82 Ill. 2d 145, 161 (1980). For this reason, this court traditionally gives less deference to the trial court in reviewing a decision to impose death than for other sentencing matters. 
Blackwell
, 171 Ill. 2d at 361.

In reviewing whether death is an appropriate penalty, we are guided by the recognition that each capital case is unique and must be evaluated on its own facts. 
People v. Johnson
, 128 Ill. 2d 253, 280 (1989). In making this evaluation, the focus must be on the circumstances of the crime and the character of the defendant. 
People v. Carlson
, 79 Ill. 2d 564, 590 (1980). Where defendant's crime is shown to be an aberration brought about by special circumstances, neither the deterrent nor retributive functions of the death penalty are served and death is an inappropriate sentence. 
Johnson
, 128 Ill. 2d at 278.

An examination of the cases where we have found death to be an inappropriate penalty reveals a consistent pattern. In those cases, the circumstances surrounding the murder generally involved the defendant acting under an extreme mental or emotional disturbance. See, 
e.g.
, 
Carlson
, 79 Ill. 2d at 590 (marital discord); 
People v. Buggs
, 112 Ill. 2d 284, 295 (1986) (marital discord); 
Johnson
, 128 Ill. 2d at 282 (job loss). In addition, the defendants in those cases generally led blameless lives with little contact with the criminal justice system. See, 
e.g.
, 
Blackwell
, 171 Ill. 2d at 364; 
Johnson
, 128 Ill. 2d at 282; 
Buggs
, 112 Ill. 2d at 295; 
Carlson
, 79 Ill. 2d at 590. Under such circumstances, this court has determined that the death penalty is excessive and inappropriate.

Defendant's character and the circumstances surrounding his crime are easily distinguishable from those cases where we have found the death penalty excessive. Defendant committed an opportunistic murder that was not the result of any stressful event or emotional circumstances. In addition, defendant's crime was not an aberration in an otherwise blameless life: he had a lengthy and continually escalating criminal history. Given the circumstances surrounding defendant's crime and his criminal history, we decline to disturb the trial court's finding that death is an appropriate penalty.

Burglary as an Aggravating Factor

The jury convicted defendant of four counts of murder, including counts of felony murder based on the predicate felonies of burglary and robbery. At his sentencing hearing, the trial judge found defendant eligible for the death penalty because the murder occurred during a burglary and a robbery. The trial judge also noted defendant's convictions on these counts during his ruling at the conclusion of the second phase of the sentencing hearing.

Defendant contends that the trial judge improperly considered that the murder occurred during the course of a burglary, because the burglary of Gasgonia's automobile was completed before the time of the murder. Although defendant does not challenge his eligibility for the death penalty, he does argue that the trial judge erred in weighing the allegedly improper factor during the second phase of his sentencing hearing.

The State challenges defendant's assertion that the burglary was over at the time of the murder. The State further argues that the defendant has waived this issue for review by failing to object to the introduction of this evidence during the sentencing hearing and by failing to include this issue in a post-trial or post-sentencing motion. In his reply brief, defendant acknowledges his procedural default but requests review of the issue as plain error. 134 Ill. 2d R. 615(a).

The plain error doctrine is a limited exception to the waiver rule. 
People v. Herrett
, 137 Ill. 2d 195, 209 (1990). “The doctrine of plain error is applied to remedy errors so plain and prejudicial that failure to object to them is not a waiver for purposes of appeal.” 
People v. Davis
, 145 Ill. 2d 240, 251 (1991). In the context of a sentencing hearing, we will review an error that is not properly preserved as plain error where the evidence is closely balanced or the error is so fundamental that it may have deprived the defendant of a fair sentencing hearing. 
People v. Beals
, 162 Ill. 2d 497, 511 (1994).

The evidence at defendant's sentencing hearing was not closely balanced. Defendant shot Gasgonia in the face while he pleaded for help, burglarizing his car and taking cash from his person. Defendant also had a long history of serious criminal behavior. While incarcerated, defendant engaged in disruptive behavior and threatened guards. Against this evidence, defendant presented testimony in mitigation that he had a difficult childhood and came from a poor section of Chicago. Defendant also continued to deny his culpability in the crimes. The evidence at defendant's sentencing hearing was not so closely balanced as to require review of defendant's claim.

The alleged error is also not of such magnitude so as to deny defendant a fair sentencing hearing. Whether or not the murder was in the course of a burglary and constituted a valid statutory aggravating factor, the trial judge was entitled to consider the evidence of the burglary in making the sentencing determination. In addition, evidence that the murder was in the course of a burglary played a minor, if any, role in defendant's sentencing hearing. The State did not argue that the murder occurred during the course of a burglary as a reason to impose death and the trial judge did no more than mention the factor during his decision. In short, the introduction of evidence that the murder was in the course of a burglary, if error, did not deprive defendant of a fair sentencing hearing. Therefore, the error is waived.

Evidence of Codefendants' Sentences

Defendant does not contend that his sentence was disparate from that of his codefendants and does not request proportionality review on appeal. See 
People v. Bean
, 137 Ill. 2d 65, 134 (1990); 
People v. Gleckler
, 82 Ill. 2d 145, 167 (1980); 
People v. Szabo
, 94 Ill. 2d 327, 351-53 (1983). Instead, defendant challenges only the trial court's refusal to admit evidence of his codefendants' sentences as mitigating evidence at his sentencing hearing. Defendant reasons that the eighth and fourteenth amendments require the admission of such evidence to insure the consistent application of the death penalty.

Defendant acknowledges that this court rejected this exact argument in 
People v. Edgeston
, 157 Ill. 2d 201 (1993). In 
Edgeston
, this court held that a defendant's request to have the jury consider evidence of a codefendant's sentence is neither constitutionally required nor relevant to the jury's examination of an individual defendant's characteristics or the circumstances of the particular offense. 
Edgeston
, 157 Ill. 2d at 239; see also 
People v. Page
, 156 Ill. 2d 258, 270 (1993). Defendant nonetheless argues that 
Edgeston
 should be reconsidered because admission of such comparative information is constitutionally necessary to prevent the sentencer from imposing the death penalty in an arbitrary manner.

Defendant's argument is without merit. In 
Pulley v. Harris
, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984), the Supreme Court rejected a similar argument that a defendant is constitutionally entitled on appeal to a comparative review of his sentence with other similar cases. The Supreme Court noted that such review was not constitutionally required to prevent arbitrary death sentences because the death penalty statute at issue already served to narrow the class of persons subject to the death penalty in an acceptable manner:

“By requiring the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small subclass of capital-eligible cases. The statutory list of relevant factors, applied to defendants within this subclass, `provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty,' [citation], `guarantee[ing] that the jury's discretion will be guided and its consideration deliberate,' [citation]. The jury's `discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' [Citation.] Its decision is reviewed by the trial judge and the State Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under 
Furman
 and our subsequent cases.” 
Pulley
, 465 U.S. at 53, 79 L. Ed. 2d at 42, 104 S. Ct. at 881.

The Illinois death penalty statute likewise adequately limits the sentencer's discretion. Therefore, we adhere to 
Edgeston
 and reject the contention that the eighth amendment requires information concerning a codefendant's sentence be presented to the sentencer.

Constitutionality of Death Penalty

Defendant raises several challenges to the constitutionality of the Illinois death penalty statute (720 ILCS 5/9–1 (West 1994)). Defendant first argues that the statute violates the eighth and fourteenth amendments because it places a burden of proof on the defendant and therefore precludes meaningful consideration of mitigation. Specifically, defendant asserts that the statute violates the eighth amendment by providing for the death penalty where evidence in mitigation is “not sufficient to preclude” it.

This court has repeatedly rejected the argument that the Illinois death penalty statute places a burden on the defendant to prove that death is an inappropriate penalty. 
People v. Guest
, 115 Ill. 2d 72, 112 (1986); 
People v. Del Vecchio
, 105 Ill. 2d 414, 446 (1985); 
People v. Simms
, 143 Ill. 2d 154, 184 (1991); 
People v. Fields
, 135 Ill. 2d 18, 76 (1990). In so holding, this court has determined that neither the State nor the defendant bears the burden of proof at the second stage of a capital sentencing hearing. 
Fields
, 135 Ill. 2d at 76; 
People v. Olinger
, 112 Ill. 2d 324, 351 (1986); 
People v. Owens
, 102 Ill. 2d 88, 115 (1984). We find the issue well settled and decline defendant's invitation to further examine it.

Defendant also asserts that the statute is unconstitutionally vague because it allows the sentencer to consider “[a]ny other reason” a defendant should be sentenced to death. See 720 ILCS 5/9–1(c), (e) (West 1994); Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992). This court has repeatedly rejected the argument that the sentencer's consideration of nonstatutory aggravating factors during the second phase of a capital sentencing hearing results in arbitrarily imposed death sentences. 
People v. Miller
, 173 Ill. 2d 167, 200 (1996); 
People v. Taylor
, 166 Ill. 2d 414, 439 (1995); 
People v. Neal
, 111 Ill. 2d 180, 203 (1985); 
People v. Madej
, 106 Ill. 2d 201, 211 (1985).

Last, defendant argues that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. Defendant does not advance any specific argument in support of his position, but instead asks us to reconsider prior decisions on a variety of issues. We note that this court has repeatedly rejected such challenges. 
Miller
, 173 Ill. 2d at 201; 
Albanese
, 104 Ill. 2d at 539-42; 
People v. Perez
, 108 Ill. 2d 70, 95-98 (1985). Further, this court has also rejected the argument that various challenged aspects of the death penalty statute, in combination, invite arbitrarily imposed death sentences. 
Simms
, 143 Ill. 2d at 185; 
People v. Tenner
, 157 Ill. 2d 341, 390 (1993). Defendant presents no reason to reexamine those cases.

CONCLUSION

For the reasons stated, the judgment of the circuit court of Lake County is affirmed. We direct the clerk of this court to enter an order setting Tuesday, January 20, 1998, as the date on which the sentence of death, entered by the circuit court of Lake County, shall be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1994). The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

Affirmed.