Docket No. 88078–Agenda 13–May 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOSEPH S. KOTLARZ, Appellant.

Opinion filed October 13, 2000.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

Defendant, Joseph S. Kotlarz, appeals his conviction for theft by deception of an amount exceeding $100,000 (720 ILCS 5/16–1 (West 1992)), for which he was sentenced to serve four years’ probation, 180 days in the Du Page County jail, 400 hours of community service, and to pay restitution of $190,000. Defendant’s main contention is that the appellate court erred in affirming his conviction (No. 2–97–l194 (unpublished order under Supreme Court Rule 23)), because the State failed to prove all the essential elements of the crime beyond a reasonable doubt. We allowed defendant’s petition for leave to appeal. 177 Ill. 2d R. 315.

At the joint Du Page County bench trial involving defendant and codefendant, Robert Hickman (Hickman), Malcolm Erickson testified that, from 1982 to 1992, he had served as chief counsel for the Illinois Toll Highway Authority (Tollway). The Tollway owned a piece of property on the north side of Interstate 88 and west of Meyers Road in Du Page County which had originally been purchased for an oasis. The property became excess because the Tollway had decided not to build an oasis on that site and the Tollway chose to sell the property.

Erickson further testified that, in 1989 and 1990, he started negotiating with Roger Berres and Gregory Constantino of Waste Management, Inc. (Waste Management), for the sale of the Meyers Road property. He stated that, during those negotiations, neither side used the services of a broker. The negotiations proved unsuccessful and the Tollway retained ownership of the property. Erickson testified that, although he was contacted by Berres in April 1991 about reopening negotiations, he directed Berres to another attorney for the Tollway and was not involved in those negotiations due to an extended illness. Erickson stated that he would not have expected a broker to participate in the sale of the property because a broker is normally used to find potential buyers and, here, the buyer was already identified. Erickson testified that in July and August of 1991, Hickman was the executive director of the Tollway. Erickson did not know defendant.

Michael Blonstein testified that he had been employed by Eagle Real Estate Services (Eagle) for 11 years, up until approximately one year before the trial in this matter. Blonstein testified in exchange for immunity from prosecution and stated that Eagle had, pursuant to an agreement with the State, returned its portion of the commission from the sale of the property to the Tollway rather than risk indictment. Blonstein stated that Eagle primarily represented shopping center developers or retailers and that, in 1990, defendant assisted Eagle in a Tinley Park real estate transaction. Defendant received over $25,000 for his assistance in the transaction.

Blonstein testified that he and defendant were friends and that, in the spring or summer of 1991, defendant asked Blonstein to pick him up at Midway Airport, explaining that he had a “dream” deal for Blonstein. When they met, defendant told Blonstein that he was going to put Eagle in a deal in order to repay Blonstein for the way he had handled the Tinley Park transaction relative to defendant. Blonstein stated that defendant explained the deal involved Waste Management purchasing property from the Tollway and that Eagle would receive $50,000. Blonstein asked what Eagle was expected to do in the deal and defendant replied that Eagle would have nothing to do and that this was his way of repaying Eagle. Blonstein testified that he asked defendant whether the deal was legitimate and defendant assured him that it was.

Blonstein further testified that he never learned many details concerning the sale of the property. When he would question defendant about the deal, defendant would put him off, telling him that when the problems were worked out, the deal would close. Blonstein learned that the total commission on the deal was to be $240,000, with $50,000 to Eagle and the balance to defendant, and that Eagle was listed in the contract as the broker of record. When the deal was scheduled to close, Eagle was directed to send an invoice indicating that it had been Waste Management’s broker. Until receiving a letter dated July 23, 1991, it was not clear to Blonstein that Eagle was representing Waste Management rather than the Tollway. The letter, on defendant’s letterhead stationary and addressed to Hickman, was given to Blonstein by defendant to provide him with some of the particulars of the deal. The letter reflected the purchase price of the property as $3.8 million and the brokerage fee to Eagle of $240,000. The State admitted into evidence copies of Eagle’s check to defendant for $190,000 and the 1099 tax form reflecting payment of the commission.

Blonstein stated that he never discussed the sale of the property with anyone from either the Tollway or Waste Management. Indeed, before attending a dinner with defendant and Hickman, defendant instructed him not to mention the deal. Blonstein testified that he had never before been brought into a transaction where he had then paid a large portion of the commission back to the purchaser’s lawyer.

George Erwood testified that he helped to form Eagle and has been its owner since 1986. Erwood stated that he first met defendant on July 1, 1991, when he handed defendant a check for his services in the Tinley Park transaction. Blonstein informed Erwood about the deal involving the Tollway and Waste Management, and he believed Eagle was to provide comparable listings. Erwood stated that no oral or written agreement existed between Eagle and either the Tollway or Waste Management. Erwood had no contact with either the Tollway or Waste Management regarding the deal, nor did he provide services to either party.

Erwood further testified that he understood defendant was representing Waste Management. At defendant’s request, Erwood drafted the broker’s invoice and sent it to the title company. A day or two later, Erwood picked up the commission check for $240,000 from the title company and deposited it. Erwood then drafted the $190,000 check to defendant, dated October 20, 1992. Erwood testified that he had never been involved in a deal in which a portion of the brokerage fee was given to the purchaser’s attorney. While Erwood admitted that he had once described Eagle as a “conduit” with respect to the deal, he regretted that choice of words but agreed that the deal was “processed” through Eagle. Erwood stated that he never believed that Eagle did anything illegal in connection with this matter, and paid back the $50,000 because he was being threatened with prosecution and felt it was the prudent course of action. Eagle made the check payable to the Tollway at the direction of the State’s Attorney’s office.

Peter Huizenga testified that he has been a member of Waste Management’s board of directors since it was formed in 1968. Huizenga had known defendant for 12 to 15 years, and Hickman for 8 to 10 years. Huizenga stated that Waste Management had been seeking the Meyers Road property for two or three years before it was actually purchased. He was aware of the personal friendship between defendant and Hickman, and introduced defendant to Waste Management because defendant indicated that he might be able to assist the company in acquiring the property. Defendant told Huizenga that he had a personal relationship with Hickman, which might be a “good fresh approach.” Huizenga testified that he was not involved in the real estate transaction and was not aware that Eagle was involved. While Huizenga did not know how defendant was going to be paid by Waste Management, he assumed that it was being handled by Roger Berres. To Huizenga’s knowledge, no one at Waste Management approved of an arrangement by defendant to receive $190,000 of sale proceeds provided to a broker.

Gregory Constantino testified that he is an attorney for Waste Management, and that in 1991 and 1992, he worked as senior attorney in real estate transactions. As part of his duties, Constantino drafted, reviewed and formulated real estate contracts and offers. In 1988 and 1989, Waste Management was attempting to obtain an easement or right of way over the Meyers Road property owned by the Tollway in order to construct a frontage road to link two of the company’s buildings. Waste Management did not use a broker during these negotiations.

In June 1991, negotiations between the Tollway and Waste Management renewed. Constantino met defendant when he was asked to go with Berres and defendant for a drive by the property, after which they all joined Hickman for lunch. Constantino had no further involvement in the negotiations and testified that Berres handled them. Constantino did, however, participate in drafting the sales contract and reviewed a draft agreement prepared by defendant. Defendant’s draft contained an offer of $3.8 million for the property and a provision for payment of $240,000 to Eagle as real estate broker. Constantino protested the provision to Berres, stating that he was unaware that a broker had been involved, did not know why Waste Management was paying a fee, and had not heard of Eagle. Constantino testified that Berres told him “this was the way the Tollway wanted the transaction.” Constantino then prepared a new version of the agreement and included a provision in which the Tollway warranted that there were no other brokers and that the commission would not exceed $240,000.

Constantino further testified that he had no knowledge of any real estate broker working on behalf of Waste Management for this property; he believed that Eagle was the Tollway’s broker. Constantino informed Berres that because Eagle was not their broker, some of the contract language should be changed. Constantino objected to three sentences which were ultimately deleted, one of which stated: “Purchaser agrees to be solely responsible for the commission due Eagle Real Estate.” Constantino explained: “We had agreed out of proceeds to pay it, out of the total that we were paying for the property, the $4,040,000. But we were not going to be solely responsible for this commission.” For this same reason, Constantino stated, he believed it was the Tollway’s responsibility to deposit the commission statement into escrow. Constantino affirmed on redirect that Waste Management’s out-of-pocket expenditure to obtain the property was $4,040,000 plus closing costs.

Ben Swislow testified that he had been employed in the Tollway’s real estate department since March 1991. He was informed about the potential sale of the Meyers Road property to Waste Management, and contacted Berres about the property, but was not involved in the negotiations regarding the sale. Swislow stated that Hickman was the executive director of the Tollway at this time, and he occasionally spoke with Hickman about the sale of the property and was told the deal was not closed. Hickman told Swislow that the Tollway would receive $3.8 million for the property.

In the winter of 1991, Hickman directed Swislow to take the contracts to Berres at Waste Management. While waiting in the reception area at Waste Management’s offices, Swislow met defendant. When Berres came down, the three men went to Berres’ office and Swislow gave him the contracts. Swislow testified that he found the broker’s commission odd because, to his knowledge, there was no broker involved in the deal and the Tollway had no broker’s agreement with respect to the property. Swislow stated that an appraisal of the property contained a variety of values, but he did recall the amount $2,265,000. He believed that the price of $3.8 million was “a fabulous price.”

Frank Howard testified under a grant of immunity. He had been defendant’s law partner from 1983 to 1987, doing the “hands on” work while defendant brought in the business. The parties stipulated that defendant’s law office was across the hall from Future Realty, that defendant used Future Realty’s fax machine, and that Hickman was never in defendant’s office. Howard testified that he became the Tollway’s chief legal counsel on November 1, 1991. Although he stated that he obtained the position by applying and interviewing for it, he acknowledged that defendant had said he would assist Howard in any way possible and told Howard that he had made efforts on his behalf. Shortly after he started his job at the Tollway, Howard was told to contact Roger Berres at Waste Management because there was a deal pending for Waste Management to purchase excess property. Howard learned of defendant’s involvement in this transaction either shortly before or after beginning employment with the Tollway. He ultimately assigned the drafting of this transaction to staff attorney Paul Olszewski.

Howard testified that he was informed that the purchase price of the property was $3.8 million, and he was involved in negotiating the other terms of the contract. Howard denied ever talking to Hickman about the purchase price. Howard testified that People’s Exhibit No. 6, a July 30, 1991, letter to Hickman, signed by defendant, outlined the terms of the deal as Howard understood them. As executive director, Hickman would have been the party responsible for negotiating the contract.

Howard further testified that, before beginning work on the project, he did not see anything in writing regarding who brought a broker into the deal. Howard was told that the commission of $240,000 was to be paid by Waste Management, and made a notation on the contract to that effect. Howard stated that, pursuant to his interpretation of the contractual language, Eagle was Waste Management’s broker. According to Howard, the board of directors would be required to expressly approve a brokerage contract for the Tollway.

Howard testified that Paul Olszewski attempted to insert three sentences into the contract which would have made it very clear that the broker was Waste Management’s, that Waste Management was to pay the commission, and that the commission was not part of the sale proceeds due the seller. When they got the contract back from Waste Management, that language had been deleted and Howard told Olszewski that it was something that he and Berres had argued over, and that this was the way the contract was to be presented to the board. Howard testified that he did not know that defendant was to receive $190,000 of the commission and, had he known, he would have investigated. No one ever told Howard that there was a $4,040,000 offer for the property before the $240,000 brokerage fee was written into the agreement.

Christine Benn testified that she was employed by the Tollway as an executive secretary from 1987 to 1994. She worked for Hickman in 1991 as his administrative assistant. Benn identified the signature on People’s Exhibit No. 2 as Hickman’s, and the parties stipulated to this fact. People’s Exhibit No. 2 was a letter dated July 17, 1991, from Hickman to Berres of Waste Management which stated, in part:

“This letter is in reference to your proposal of July 10, 1991. My Board and I would react negatively to any offer below four million dollars and it would probably take a little more than that to gain our approval.

Your next proposal should include a reference to the brokerage fee. This is made payable to the Eagle Real Estate Services and will be at six percent of the purchase price.”

Robert Douglas testified that he was a senior attorney employed by the Tollway in 1991. In 1992, he was appointed assistant chief counsel to Frank Howard. Douglas stated that he was familiar with the procedures for the sale of excess property in 1991. Douglas testified that he first became aware of the Meyers Road transaction in August 1993, after a discussion with Paul Olszewski. Douglas thereafter brought the information to the attention of the Tollway chairman’s secretary, and then met with the chairman, John Garrow, and with the Illinois State Police. Douglas testified that he copied the contents of the file on the Meyers Road transaction and turned it over to the police. In April 1994, Douglas learned that he had been stripped of his designation as a special assistant attorney general, a title which Tollway attorneys held at that time. The form terminating his position was initialed by Howard and Hickman. Douglas testified that he reported to Howard, a department head, and that the department heads were given the freedom to operate as they saw fit. Douglas was never told of any dissatisfaction with the quality of his work.

Paul Olszewski testified that he was an assistant attorney general for the Tollway whose responsibilities included drafting contracts for real estate sales. Olszewski stated that, in 1992, Howard assigned him to review the contract for the Meyers Road property, People’s Exhibit No. 12, and told him that his contact at Waste Management was Roger Berres. Olszewski testified that, before he reviewed the purchase price on the contract, he talked to Ben Swislow, who voiced some concerns. Swislow advised Olszewski that defendant was involved in the deal, that the purchase price was to have been $4 million, and that there had previously not been a broker involved in the deal.

Olszewski reviewed the price and brokerage provisions of the contract and noted that the stated purchase price, $3.8 million, was essentially $4 million less the commission. When Olszewski related this fact to Howard, Howard advised him that the purchase price was $3.8 million and that the commission was over and above that. Pursuant to this conversation with Howard, Olszewski redrafted the paragraph dealing with the brokerage fees to provide that the fees were independent of the sales price, that the purchaser was to be solely responsible for the commission, and that the purchaser would reimburse the seller for any costs involved in a commission claim. Olszewski testified that he understood that the Tollway had no brokerage agreement with anyone and drafted the brokerage provisions to make it clear that the Tollway “was not on the hook.” Olszewski stated that, when he asked Howard about Swislow’s comments, Howard responded, “ I don’t know a thing about it. It’s Hickman’s deal.”

Olszewski further testified that he reviewed the second draft of the contract from Waste Management with Howard and noted that the brokerage provisions had been changed back to the original language. Howard appeared upset that the language had been changed, but said that the Tollway would have to “live with it.” In Olszewski’s opinion, this version was less acceptable than the original because it contained a warranty from the Tollway that the commission would not exceed $240,000, which created the impression that the Tollway approved of the commission. Olszewski testified that this version of the brokerage provision was ultimately accepted in the final contract. Olszewski stated that he never talked with Hickman about the contract and that he did not deal with defendant on this transaction.

Roger Berres testified that he had been employed by Waste Management as an attorney and as director of real estate from February 1981 until October 1996. During 1991 and 1992, Berres reported to the corporate controller and was not a member of the legal department; his duties involved real estate transactions. Berres stated that he was involved in negotiating the purchase of the Meyers Road property from the Tollway. In the late 1980s, he had unsuccessfully negotiated with the Tollway in an attempt to obtain an easement on the property. Berres noted that, at that time, no broker was involved in the negotiations.

 Berres testified that in May or June 1991, after Hickman had become executive director of the Tollway, Berres renewed negotiations over the property. Berres stated that Peter Huizenga, from the board of directors of Waste Management, instructed him to contact defendant, explaining that defendant was Hickman’s friend. Berres testified that Waste Management engaged defendant as an attorney to assist them in negotiations with the Tollway. Their arrangement was confirmed by a letter which instructed defendant on how to document his time and expenses and how to submit bills to Waste Management. Defendant did not dispute the instructions or otherwise indicate that he would not abide by them. Berres stated that Waste Management did not contemplate paying defendant on a contingency basis.

In June 1991, Berres called defendant and met with him and Constantino, after which they met with Hickman over lunch to discuss the Meyers Road property. Hickman referred Berres to Swislow for further discussion. In later negotiations, defendant took the lead for Waste Management, informing Berres of the progress he was making.

Berres testified that on July 8, 1991, he drafted a letter of intent, People’s Exhibit No. 1, in which the purchase price for the property was $4 million and which did not mention either the presence of a broker or a broker’s fee. Berres sent the letter to defendant for his review, as it was an accurate recitation of the terms that Waste Management wanted to submit to the Tollway.

Berres testified that he received People’s Exhibit No. 2, the July 17, 1991, letter on Tollway stationary from Hickman, which directed Waste Management to include a broker’s fee of 6% of the purchase price, payable to Eagle, in their next proposal. Berres stated that, before receiving this letter, he had not heard of Eagle and was unaware that there was a broker involved in the deal. Berres discussed the matter with an attorney in the ethics and corporate compliance department of Waste Management. That attorney told Berres the Tollway was entitled to direct that a portion of its proceeds be paid to a broker and Waste Management could accommodate that instruction. Berres testified that, in the discussion, he speculated that perhaps Eagle had an institutional relationship with the Tollway, even though he had not had any contact with Eagle during the negotiations.

Berres prepared a letter of intent, People’s Exhibit No. 4, for defendant’s signature, showing the purchase price as $4,040,000 and deleting the reference to broker’s fees. Berres explained that this letter was in response to People’s Exhibit No. 3, a proposed letter of intent that defendant had prepared which contemplated Waste Management’s payment of the brokerage fee out of the $4,040,000. Berres believed that Waste Management had not engaged a broker and the letter should merely reflect the total purchase price, allowing the Tollway to disburse the purchase price as it wished. Berres testified that he faxed People’s Exhibit No. 4 to defendant, having copied and recreated defendant’s letterhead so that the letter would not have to be retyped for defendant’s signature and to insure that it would be in the correct format.

Berres identified People’s Exhibit No. 6 as a letter dated July 30, 1991, from defendant to Hickman proposing a purchase price of $3.8 million and payment of a $240,000 commission. Berres stated that this was the final letter of intent between the parties. However, because Berres was not used to having outside law firms submitting the letters of intent for Waste Management, he sent a second letter to Hickman that mirrored defendant’s July 30 letter, to round out the file. Berres testified that he did not insist that the provisions regarding the final purchase price and commission be included and did not recall whether he discussed those provisions with defendant. Berres did not order or authorize that the invoice from Eagle be sent to Waste Management.

Berres further testified that the draft contract was sent to Constantino for review and redrafting. Berres explained that he objected to the Tollway’s draft contract, People’s Exhibit No. 13, because it did not embody his understanding of the details of the agreement; it provided that the commission was not part of the proceeds due to the seller and was to be paid from the purchaser’s funds independent of the closing. Additionally, Berres objected to the language that Waste Management was solely responsible for the commission due Eagle and that Waste Management would hold the Tollway harmless for the commission, because Waste Management was not informed of the terms of the brokerage agreement. Berres testified that Waste Management did not have a contract or agreement with Eagle.

After speaking with Olszewski, Berres and Constantino submitted another draft of the contract deleting the objectionable language. This version, People’s Exhibit No. 19, included a provision by which the Tollway warranted that the commission would not exceed $240,000. Berres testified that this provision was inserted based on his assumption that the Tollway knew the terms of the brokerage agreement. Waste Management insisted upon the inclusion of the “seller warrants” provision and it was included in the final contract.

Berres testified that he never knew that defendant was going to receive $190,000 of the brokerage fee, and he would not have agreed to the transaction if he had known of that fact. Berres did not authorize a contingency fee arrangement with defendant, nor did anyone at Waste Management tell him that defendant was authorized to take a portion of the commission. Berres testified that he did not know that defendant brought Eagle into the deal and that Eagle was never the broker for Waste Management.

On cross-examination, Berres testified that he did not recall being asked a specific question about a contingency fee arrangement during his testimony before the grand jury in 1994. Berres explained that, if he told the grand jury that there was a commission or percentage fee arrangement with defendant, he either misunderstood the question or the transcript was in error, because he was asked similar questions several times during that testimony and had repeatedly stated there was no arrangement like that. Berres did not recall telling the police that defendant’s relationship with Waste Management was not covered by a contract and that defendant was “not a force in the deal.” Berres could not recall telling the police first that there was no broker in the deal and then stating that he could not recall a broker. Berres also did not recall telling the police that he discussed the payment to Eagle with Olszewski or that he believed the payment to be the Tollway’s business.

During further cross-examination, Berres denied that he was “very disappointed” with the final purchase price, but acknowledged his grand jury testimony that Waste Management was hoping to acquire the property for far less and that they had ended up paying more than the $3 or $4 per square foot for which comparable properties had been selling. Berres explained that the purchase price was dependent on the seller and the motivations of the buyer.

Berres also acknowledged that a bill submitted by defendant referred to conversations with a real estate broker in July 1991, but Berres denied that defendant mentioned the broker to him. Although the bill was directed to Waste Management, Berres explained that Constantino had handled the closing and that he was unaware of the bill referencing a broker until it was drawn to his attention by one of the prosecutors. However, by the time Berres received this bill, the broker had already been included in the deal and he would have had no reason to be suspicious of defendant’s speaking with a broker.

Berres denied that he had attempted to renegotiate the price of the property with Ben Swislow of the Tollway in November 1991, or that he had told that to police. Berres admitted that while defendant submitted his final bill to Waste Management in November 1991, he had contacted defendant in January 1992, about a related piece of property. Berres denied that he told defendant to stop billing Waste Management because he knew that defendant was going to receive compensation through the brokerage fee, stating that he was not in the habit of requesting billings from outside counsel. Berres acknowledged that Constantino filed a transfer tax declaration listing the purchase price of the property as $3.8 million, and that the warranty deed filed with the county recorder showed that same purchase price. Berres testified that $3.8 million was a correct statement of the purchase price in his mind.

Mark Tenney, a retired consulting engineer, testified that he first met defendant in 1991. The two discussed whether defendant could assist Tenney’s firm in expanding its activities in the State of Illinois, and defendant spoke of his ability to help the firm with the Tollway. Tenney testified that defendant informed him that he had a good relationship with Hickman and that he shared an office with the Tollway’s legal counsel, Frank Howard. Tenney’s firm ultimately entered into a consulting agreement whereby it paid defendant a retainer of $5,000 per month for 24 months, with a $30,000 bonus. This consulting contract also included a percentage agreement, which was 6% of the net fees on two jobs the firm performed for the Tollway, yielding defendant $80,000.

Before Tenney’s firm retained defendant, its contracts with the Tollway totaled approximately $200,000; after defendant was retained, the contracts with the Tollway totaled $3.3 million. However, Tenney explained that the scope of his business expanded greatly the year he hired defendant. Tenney testified that defendant also introduced him to Peter Huizenga at Waste Management, but this meeting did not result in any business for the firm. Tenney also testified that it was a common industry practice to use consultants to generate business and make contacts with potential employers.

John Garrow testified that he was the chairman and director of the Tollway from 1991 to 1995. Garrow’s was not a full-time position: he spent 15 to 20 hours per week on his job. Garrow testified that the Tollway board approved 600 to 700 contracts of all types during the course of a year. Garrow did not read each word in each contract, but relied on the recommendations of the department heads who presented the contract. Garrow identified People’s Exhibit No. 26 as the April 30, 1992, resolution approving the sale of the Meyers Road property to Waste Management. Garrow stated that it was one of 69 resolutions passed at that board meeting.

Garrow testified that, in August 1991, he informed Hickman that he had learned that defendant was approaching Tollway suppliers saying he had a good relationship with the executive director of the Tollway, Hickman, and he could get them business with the Tollway. Hickman responded that this information was news to him, that defendant was acting without his knowledge or approval, and that it would have to stop. Garrow had also learned from Hickman that Howard would be appointed as chief counsel and that he was defendant’s former law partner. Shortly after his meeting with Hickman, Garrow met defendant for the first time. Garrow testified that defendant told him “he had made some mistakes,” and that they would not happen again.

Garrow further testified that, to his knowledge, the Tollway did not have a broker in the Meyers Road property sale. He explained that the board would have had to pass a resolution in order to retain the services of a broker, and none was passed. Garrow stated that when the board ratified the sales contract on April 30, 1992, it had a $3.8 million purchase price. Garrow did not know that on July 17, 1991, Hickman had represented to Waste Management that the board would not accept a price of less than $4 million. Garrow testified that he had no knowledge that defendant was involved in the transaction, and did not know how Eagle became involved or that Eagle did not have a contract with Waste Management. Garrow also did not know that defendant had received $190,000 from the transaction. Garrow testified that, had he known these facts, he would not have voted in favor of the resolution to sell the Meyers Road property. Garrow stated that the deal was discussed in an executive session of the board at which no mention was made of the broker’s commission in the sale.

Garrow testified that he first became aware of defendant’s involvement and of the broker’s commission in October 1993, when he was told by Robert Douglas. Garrow reported the information to the state police. In April 1994, Garrow questioned Hickman about Douglas’ termination, and Hickman said that Howard felt that Douglas was saying things detrimental to him personally and that he was a “leaker.”

Garrow acknowledged that the minutes of the meeting wherein this contract was approved reflected that the board had been apprised of the items on the agenda and had ample opportunity to consider and discuss each item. Garrow indicated that he would have more carefully scrutinized a contract offered by an outside supplier. He testified that he signed the contract following passage of the resolution without having read it “real carefully” or understanding it. If a contract had been approved by the board, it was his practice to sign it without reading it. Garrow explained that he often did not understand the details of contracts presented to him, that is why he relied upon the recommendations of the Tollway department heads. Garrow testified that he had no reason to distrust either Hickman or Howard. Garrow “guessed” that the commission had been paid by Waste Management. He never received a copy of People’s Exhibit No. 2, the letter from Hickman to Waste Management requiring the insertion of Eagle as broker.

Joseph Haughey testified that he is a commander in the Illinois State Police and is an attorney. In December 1993, he was in charge of internal investigations and conducted the investigation of this real estate transaction between the Tollway and Waste Management. Haughey stated that he met with Garrow and Douglas, who later provided him with documents relating to the investigation. However, Haughey did not originally receive copies of several of the State’s exhibits.

Haughey testified that in March 1994, he interviewed Ben Swislow at the Tollway offices and attempted to interview Paul Olszewski. Haughey stated that Howard insisted on remaining with Olszewski, asserting that he represented the Tollway and its employees. Haughey decided not to conduct the interview, but requested a copy of the Tollway’s file concerning the transaction. Haughey testified that the documents he received from the Tollway did not include copies of People’s Exhibit Nos. 2, 6, 12, and the last two pages of 11. He stated that Waste Management failed to produce People’s Exhibit Nos. 12 and the last two pages of 11, but did produce Nos. 2 and 6. Eagle produced the last two pages of People’s Exhibit No. 11 and defendant turned over Nos. 2 and 11 when subpoenaed.

Daniel Fusco testified that he is an attorney and was a member of the Tollway’s board of directors in 1991. He reviewed contracts, sales, and purchase orders for the Tollway. Fusco stated that any transaction over $10,000 was submitted to the board for approval and that the board approved over 500 contracts annually. The contracts were generally first presented at operations meetings during which board members would have the opportunity to question the staff in charge of each contract. Fusco testified that the board relied on the Tollway staff, including its general counsel and executive director, and did not read through every contract, since many of them were standardized. Fusco stated that he would be more involved with the real estate contracts because that was his area of expertise. Fusco testified that the contract involved in this case was not one which would have been quickly skimmed over, as it was an important transaction.

Fusco further testified that he recalled the sale of the Meyers Road property and believed that he had voted to ratify the contract, which had a purchase price of $3.8 million. Fusco stated that, at the time of the board’s vote, he had not seen Hickman’s July 17, 1991, letter to Berres (People’s Exhibit No. 2), was not aware that Hickman represented to Waste Management that the Tollway would not accept a purchase price of less than $4 million, and did not know that defendant was to receive $190,000 of the commission. Fusco testified that he would have asked more questions had he known that defendant was receiving funds from the transaction and that defendant’s participation should have been disclosed. Fusco stated that there had been a discussion about the contract during an executive session of the directors and that when one of the directors asked whether there was a commission on the deal, Howard replied that there was. Fusco testified that he had been comfortable with the purchase price.

Don Zimmer testified that, in 1992, he was employed with a consulting engineering firm which provided services for public and private clients, including the Tollway. Zimmer stated that Peter Huizenga recommended defendant to him as someone who might be helpful to his business. Zimmer met with defendant, who indicated that he was familiar with the Tollway’s capital improvement program and that he had relationships that could position Zimmer’s firm to win more Tollway contracts. Zimmer testified that defendant specifically mentioned that Hickman was one of the people at the Tollway with whom he had a good relationship. Zimmer’s firm hired defendant and paid him $5,000 per month for one year. Defendant introduced Zimmer to Hickman. Zimmer stated that hiring lobbyists or consultants is not uncommon to “open the door” for business opportunities.

Arthur Philip, a member of the Tollway’s board of directors, testified that he was familiar with the sale of the Meyers Road property. Phillip stated that he had voted in favor of the sale and was familiar with the general terms of the deal, but that he had not personally reviewed the contract. Phillip explained that he is not a lawyer and relied on the Tollway’s lawyer and staff for advice concerning the merits of the deal. He had not been informed that Eagle was participating in the transaction or that defendant was to receive $190,000 of a $240,000 commission. Phillip testified that, had he known these facts, he would not have voted in favor of the sale. While Phillip was aware that the Meyers Road property had been appraised for $2.265 million, he did not believe the Tollway had received a “great deal” because Waste Management had paid more per square foot for other properties than it paid the Tollway.

Gayle Franzen testified that he was executive director of the Tollway from 1981 to 1984. He was familiar with John Garrow, Hickman and defendant and had been friends with defendant for a number of years. Franzen testified that, in the summer of 1991, Garrow approached him with concerns about the relationship between defendant and Hickman. As a result, Franzen arranged a lunch meeting to introduce defendant to Garrow. During the lunch, defendant clearly indicated that he and Hickman were close friends and admitted that he may have made mistakes with respect to Hickman’s position with the Tollway, but stated that he would never embarrass Hickman. Franzen also testified that he met defendant with Hickman and his family while vacationing on Martha’s Vineyard in the fall of 1993. Franzen stated that the concerns about defendant’s activities came from Garrow, not from him.

The parties stipulated that, if called, Robert Neal would testify that he was a member of the Tollway’s board of directors in 1992. Neal was provided with the documents concerning the Meyers Road transaction, but did not read the sales contract in detail before voting in favor of it. Neal relied on the Tollway staff, including the recommendations of the chief legal counsel. Neal did not know of Eagle’s participation in the transaction or defendant’s receipt of $190,000 through Eagle; had he known those facts, he would not have voted to ratify the contract.

The parties stipulated that, if called, Christopher Berg would testify that, in 1991, he owned a consulting engineering firm and was approached by defendant late that year. Defendant informed Berg that he had a good relationship with Hickman and promised that he could help Berg acquire Tollway work. Berg hired defendant as a consultant and paid him $5,000 per month from January 1992, continuing through the time of trial. Defendant obtained business for Berg’s firm from the Tollway as well as other state agencies.

The parties stipulated that, if called, Rob Petroelje would testify that he was a part owner of SDI Consultants (SDI) and he met defendant through Peter Huizenga. Defendant informed Petroelje that he was a close friend of Hickman, knew other officials at the Tollway, and could help SDI obtain Tollway contracts, as well as promote the firm in the public sector. Petroelje hired defendant as a consultant and paid him $2,000 per month from May 1993 through July 1994.

The parties also stipulated that the $190,000 check from Eagle to defendant had been deposited and cashed through the checking account of defendant’s consulting firm. At the close of the State’s case, defendant filed a motion for judgment of acquittal, which the trial court denied following extensive argument.

Defendant presented certain evidence by means of stipulation. If called, Lieutenant Michalski of the Illinois State Police would testify that, on March 31, 1994, he interviewed Roger Berres at Waste Management’s offices and that Berres stated that defendant was “not a force” in the Tollway deal. When asked whether anyone was acting as a real estate broker for this transaction, Berres vacillated between “no” and “I don’t know.” Berres further said that he had not talked with anyone at Eagle and denied that Waste Management had any involvement with Eagle. Berres stated that he was unfamiliar with the term of the contract directing Waste Management to pay the $240,000 fee to Eagle, and that Paul Olszewski brought Eagle into the contract. Michalski asked Berres if he felt the payment to Eagle was a legitimate business practice, to which Berres replied that it may have been “a strategic alliance or outsourccing [
sic
].”

If called by the defense, Commander Joseph Haughey of the Illinois State Police would testify that he interviewed Robert Douglas on November 23, 1994, and Douglas stated that John Garrow had requested that Douglas obtain documents from the Tollway. Douglas subsequently asked Paul Olszewski for the Meyers Road file under the ruse of having to research issues relating to the annexation of the parcel. Haughey would further testify that, during an interview with Roger Berres on April 13, 1994, Berres stated that he could not recall who put the initial offer on the table for this transaction, and that either Olszewski or Swislow of the Tollway introduced the brokerage fee. Later in the interview, Berres told Haughey that he felt the fee was simply an allocation of purchase price by the seller, and commented that Waste Management was getting “squeezed” for $240,000 in the negotiation. Finally, Haughey would testify that, in a November 4, 1994, interview, Berres stated that he prepared the July 23 letter of intent using defendant’s law firm letterhead “in the interest of expediency and in order to strike the brokerage fee language, but to include the $240,000 fee in the purchase price, which then amounted to $4,040,000.”

It was also stipulated that Berres testified before the grand jury that, sometime prior to receiving the July letter from Hickman, he had made an offer “in the one and a half to two million dollar range” for the property. Berres answered “yes” to the question whether there was any commission or percentage fee arrangement with defendant. Berres also testified before the grand jury that he spoke to Olszewski to confirm that Eagle was the Tollway’s broker.

In ruling, the trial court stated, 
inter alia
, that the parties seemed to agree that the key witness was Roger Berres and, with regard to his credibility, noted that “lawyers do not make good witnesses.” The trial court found that the evidence showed that at one point Waste Management was willing to, and did ultimately, pay $4,040,000 for the property, $3.8 million going to the Tollway and $240,000 to Eagle. The trial court found it apparent that if Waste Management had known that they could have purchased the property for $3.8 million, without the additional brokerage fee, they would have done so, and that if the Tollway had been able to get $4,040,000, they would not have rejected it. The trial court therefore likened the $240,000 to a “shell game.”

The trial court further found that the testimony and documents showed that defendant introduced Eagle into the transaction. The July 8, 1991, letter from Berres to defendant, People’s Exhibit No. 1, set forth a proposal of $4 million. In the July 17, 1991, letter, People’s Exhibit No. 2, faxed from Future Realty at the same address as defendant’s law office, Hickman acknowledges the $4 million offer, and states that it might take a little more for the Tollway board of directors to approve the transaction. The court noted that People’s Exhibit No. 2 was also the first written document “in which the broker is injected.” The trial court found that the relationship between defendant and Hickman was clearly established and that the two men realized Waste Management had a $4 million dollar offer on the table and the Tollway would accept $3.8 million, as it was substantially over the appraised value. The court therefore concluded that the $240,000 was “siphoned off” to Eagle, with a portion ultimately being paid to defendant. The trial court accordingly found defendant guilty on “Count 5, which is theft in excess of $100,000.00.”

On direct appeal, defendant argued, 
inter alia
, that the State failed to prove him guilty beyond a reasonable doubt. Specifically, defendant argued that the State failed to prove he made any affirmative misrepresentation or that Waste Management relied on any affirmative misrepresentation, and that the State failed to prove ownership of the stolen property. The appellate court rejected these arguments. No. 2–97–1194 (unpublished order under Supreme Court Rule 23). We now affirm the appellate court.

In reviewing the sufficiency of the evidence to sustain a verdict on appeal, the relevant inquiry is “whether, after viewing the evidence in the light most favorable to the prosecution, 
any
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” (Emphasis in original.) 
Jackson v. Virginia
, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979); 
People v. Thomas
, 178 Ill. 2d 215, 231-32 (1997); 
People v. Howery
, 178 Ill. 2d 1, 38 (1997). Under this standard, a reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses. 
Thomas
, 178 Ill. 2d at 232. Indeed, it is the responsibility of the trier of fact to “fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” 
Jackson
, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; 
Howery
, 178 Ill. 2d at 38. This same standard of review applies regardless of whether the evidence is direct or circumstantial (
Thomas
, 178 Ill. 2d at 232), and regardless of whether the defendant receives a bench or jury trial (
Howery
, 178 Ill. 2d at 38).

Applying this standard, we must reject defendant’s claim that he was not proven guilty beyond a reasonable doubt. In this court, defendant contends that the State failed to prove certain elements of the offense, arguing that, while defendant helped Waste Management obtain the Tollway’s property “through influence, relationships, and the power that comes from having large amounts of available money,” defendant’s conduct “absolutely does not offend Illinois’ criminal provision involving theft by deception.” However, defendant’s attempt to diffuse his guilt by impugning the motives and integrity of the parties to this transaction fails, where it does not obscure the fact that he, in addition to helping Waste Management obtain the Meyers Road property, took $240,000 which the evidence shows those parties did not intend him to have.

One commits theft by deception when he “knowingly *** [o]btains by deception control over property of the owner” and “[i]ntends to deprive the owner permanently of the use or benefit of the property.” 720 ILCS 5/16–1(a)(2)(A) (West 1992); 
People v. Davis
, 112 Ill. 2d 55, 59 (1986); 
People v. Kaye
, 154 Ill. App. 3d 562, 571 (1987). In order to convict a defendant of theft by deception, the State must prove that: (1) the victim was induced to part with money; (2) the transfer of the money was based upon deception; (3) defendant intended permanently to deprive the victim of the money; and (4) defendant acted with specific intent to defraud the victim. See 
People v. Moran
, 260 Ill. App. 3d 154, 160 (1994); 
People v. McManus
, 197 Ill. App. 3d 1085, 1096 (1990).

We first address defendant’s contention that the appellate court erred in upholding defendant’s conviction where Waste Management, “the purported victim of [defendant’s] theft, was, under the State’s theory, involved in the alleged scheme ‘up to its eyeballs’ and where the trial judge made a factual finding that the transaction at issue was not considered by its principals to be an arm’s length business deal.” While defendant argues that these “facts” preclude either a finding that deception occurred or that any party gave money in reliance on any affirmative misrepresentation, a careful review of the record shows that defendant has taken these statements entirely out of context.

While the State did acknowledge in closing argument that Waste Management was “in this up to its eyeballs,” defendant and the State agree that this statement referred to Waste Management’s involvement in “influence-peddling.” Thus, while admitting Waste Management’s knowledge of the close relationship between its “consultant,” defendant, and the Tollway’s executive director, Hickman, the State in no way imputed knowledge of the theft to Waste Management. Rather, the prosecutor went on to argue in closing that “ to allege *** that Roger Berres knew about this and went along with it, I submit to you, Judge, is absurd.” The prosecutor further argued that to accept defendant’s theory, “they would have to convince you that Waste Management was actually able to pay [defendant] as a consultant, anything they want up front and lawfully, [yet] would go this far out of their way to make a crime out of it,” by choosing “this incredible means of smuggling their own money to their own lawyer or consultant.”

Defendant’s assertion that the trial court found the principals, Waste Management and the Tollway, were not involved in an “arm’s length transaction” is also a mischaracterization of the record. It is obvious from an examination of the court’s remarks that the court was referring to the relationship between defendant and Hickman, not between the principals. As previously stated, the trial court found that if Waste Management had known it could purchase the property for $3.8 million, it would have paid no more, and that if the Tollway had known it could get $4,040,000 for the property, it would have done so. Thus, defendant has failed to show that the trial court believed that Waste Management or the Tollway were dealing at less than arm’s length.

Nor does the evidence presented at trial establish knowledge of defendant and Hickman’s plan by anyone involved except for Blonstein and Erwood of Eagle and Howard, the Tollway’s chief legal counsel, who all testified under a grant of immunity. Instead, the evidence showed that when Constantino, who knew that Waste Management had not retained Eagle, reviewed the first draft of the contract from defendant, he found the language regarding the brokerage fee unacceptable, and asked Berres about it. Berres told Constantino that “this was the way the Tollway wanted the transaction,” so Constantino created a draft contract placing the responsibility for the broker’s commission on the Tollway.

When this document reached Olszewski at the Tollway, he protested the language suggesting that Eagle might be the realtor for the Tollway and that the Tollway approved the commission. Olszewski attempted to redraft the contract to show that the Tollway was not responsible for the realtor. That draft was sent to Waste Management, where Constantino and Berres reviewed it and found the language unacceptable because it made it appear that Eagle was Waste Management’s broker, which was not the case. Berres and Constantino therefore changed the offensive language, adding certain provisions including that “[s]eller warrants that said commission does not exceed $240,000.” When this draft was sent to the Tollway, Olszewski again protested but was told by Howard that they would have to “live with it.” The contract was ultimately signed in this form, with Waste Management believing that it was paying to the Tollway’s broker a commission out of the purchase price due the Tollway, and the Tollway believing that the broker’s commission was to be paid by Waste Management over and above the price it was receiving for the land being sold.

 Having found that, contrary to defendant’s contention, Waste Management and the Tollway were not willing participants in this scheme, or “shell game,” we return to the question of whether the evidence presented at trial supports a finding that defendant obtained the $240,000 by deception. The term “deception,” for purposes of the theft statute, means, 
inter alia
, to knowingly “[c]reate or confirm another’s impression which is false and which the offender does not believe to be true,” or “[f]ail to correct a false impression which the offender previously has created or confirmed,” or “[p]revent another from acquiring information pertinent to the disposition of the property involved.” 720 ILCS 5/15–4(a), (b), (c) (West 1992); see 
Davis
, 112 Ill. 2d at 59-60. Here, the trial court found that the deception lay in the fact that the land’s purchase price was manipulated to divert funds from the Tollway to defendant, while not substantially changing the total amount of money Waste Management paid for the property. We believe the evidence clearly established that defendant knowingly participated in this deception.

At trial, the State adduced the following facts and reasonable inferences therefrom: In the spring of 1991, defendant retained Eagle to act as the broker of record for the Meyers Road transaction, meeting with Blonstein and offering him a “dream” deal wherein Eagle would receive $50,000 and would not be required to do any work. Thereafter, on July 8, 1991, Berres sent a draft letter to defendant, People’s Exhibit No. 1, in which Waste Management offered $4 million to purchase the property and which did not contain any provision for a broker’s fee. Although Eagle was never hired by either Waste Management or the Tollway, People’s Exhibit No. 2, Hickman’s July 17, 1991, letter, sent via defendant and the fax machine he routinely used at Future Realty, directed Waste Management to include Eagle as the broker and set the amount of commission at 6%. While there is no direct evidence that defendant relayed Berres’ $4 million offer to Hickman, this July 17 letter references a Waste Management “proposal of July 10, 1991,” and there is no evidence in the record of such a proposal other than Berres’ July 8 letter. Additionally, Hickman’s letter responds: “My Board and I would react negatively to any offer below four million dollars and it would probably take a little more than that to gain our approval.” Moreover, the brokerage fee was set at $240,000, which is 6% of $4 million. Thus, the trial court could reasonably infer that defendant and Hickman, by creating a false impression that there was a broker in the transaction entitled to be paid, manipulated the price of the property to divert $240,000 to defendant while the total price still appeared to be $4 million.

Other evidence presented during trial indicated that defendant confirmed the false impression that a legitimate broker was involved by including in his billings to Waste Management references to meetings and telephone calls with the broker. Hickman, for his part, did not share with the Tollway’s staff the representations he had made in the July 17, 1991, letter, 
i.e.
, that he had requested Eagle be included as the broker and paid a commission, and that the Tollway would not accept less than $4 million for the property. Indeed, Hickman told the board, as reflected in the final contract, that the Tollway would receive $3.8 million for the deal.

The evidence also showed, as earlier detailed, that due to defendant and Hickman’s control of information between the parties, Waste Management and the Tollway each believed the broker to be working for the other. Finally, it was uncontroverted that defendant received $190,000 of the commission which was ostensibly to go to Eagle. Thus, the State proved beyond a reasonable doubt that, through defendant’s deceptive acts of creating, confirming, and failing to correct false impressions made to Waste Management and the Tollway which defendant knew to be untrue, and preventing those parties from acquiring information pertinent to the disposition of the sale proceeds, defendant orchestrated and conducted a theft of $240,000 from the sale of the Meyers Road property.

Finally, defendant claims that he cannot be properly found guilty of theft under count V of the indictment because that count named only one victim, Waste Management, and the trial court “insisted that restitution be paid, not to the identified victim, but to [the Tollway].” However, we agree with the State that defendant’s argument is fatally flawed because he mistakenly asserts that Waste Management was the only victim alleged in count V.

Defendant was convicted of count V of the indictment, which reads, in pertinent part:

“Joseph S. Kotlarz committed the offense of Theft Over $100,000.00 in that the said 
defendant obtained, by deception, control over certain property being $240,000
, said property being the property of Waste Management, Inc., deposited into escrow for the purpose of purchasing certain real property from the Illinois State Toll Highway Authority, *** 
with the intent to deprive the parties having a lawful interest in said funds, Waste Management Inc. and the Illinois State Toll Highway Authority
, 
permanently of the benefit of said funds
, in that said defendant retained Eagle Real Estate Services, Ltd. for the purpose of receiving the $240,000.00 pursuant to an agreement that said defendant receive $190,000.00 while Eagle Real Estate Services, Ltd. retained $50,000.00; in violation of 720 ILCS 5/16–1(a).” (Emphasis added.)

 For purposes of the theft statute, an owner is defined as “a person, other than the offender, who has possession of or any other interest in the property involved, even though such interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property.” 720 ILCS 5/15–2 (West 1992); see
 Moran
, 260 Ill. App. 3d at 160; 
Kaye
, 154 Ill. App. 3d at 571. A reading of count V makes it clear that both Waste Management and the Tollway were named as owners of “certain property being $240,000" by virtue of their “lawful interest in said funds,” that interest being that the funds had been deposited into escrow by Waste Management “for the purpose of purchasing certain real property from the [Tollway].” Thus, where count V alleged that both Waste Management and the Tollway had an “interest in the property involved,” we find that it sufficiently named both parties as victims of defendant’s theft. See 
Kaye
, 154 Ill. App. 3d at 571 (fact that defendant was paid alleged bribe with money supplied by FBI rather than by victim did not prevent victim from being “owner” of property within meaning of theft statute, where victim’s “interest” in bribe money was clear in light of defendant’s threats to him if he should fail to pay and his capacity as middleman for FBI).

Further, we agree with the State that it proved the funds at issue were “released pursuant to and authorized only by the contract,” and that “[d]efendant had no authority to get the funds here before both parties signed the contract.” Therefore, the trial court could properly find defendant was guilty of theft from both parties. Additionally, we see no abuse of discretion in the trial court’s restitution order; given the evidence that Waste Management had made a $4 million offer for the land prior to the insertion of deception into the contract negotiations, the court could reasonably infer that the siphoned funds would have been paid out to the Tollway.

In conclusion, after viewing the above evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of theft by deception, as charged in count V, proved beyond a reasonable doubt. Defendant also argues before this court that the lower courts erred by expanding the theft by deception statute to “combat public corruption.” However, as we have found that defendant was properly convicted of theft by deception, we need not address this additional attempt by defendant to construe his conduct as simple “influence peddling.”

Accordingly and for the foregoing reasons, we affirm the judgment of the appellate court.

Affirmed.

JUSTICES BILANDIC and McMORROW took no part in the consideration or decision of this case.

JUSTICE HEIPLE dissents [without opinion].