2021 IL App (2d) 200111-U
No. 2-20-0111
Order filed June 10, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-2262 |
| JESUS BERMUDEZ, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence supported defendant's conviction of a sexual assault that occurred several years earlier when defendant was residing with the victim's family.  The trial court found the victim credible; the record showed no motive to lie, and the discrepancies in the State's evidence were collateral to the issue of defendant's guilt.

¶ 2    Defendant, Jesus Bermudez, appeals his conviction of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)).  He contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt.  We affirm.

¶ 3                                      I. BACKGROUND

¶ 4     Defendant was charged with two counts of predatory criminal sexual assault of a child, in that he knowingly committed an act of sexual penetration with C.O., who was under the age of 13 when the act was committed. He was also charged with two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b), (c)(1)(i) (West 2016)), both of which alleged that he committed an act of sexual conduct with C.O. by touching her vagina for his sexual arousal. The allegations came to light in December 2016 when C.O. made them to a therapist.

¶ 5     Before trial, the trial court granted the State's motion *in limine* to permit propensity evidence (see 725 ILCS 5/115-7.3 (West 2016)) in the form of testimony from C.O.'s older sister, M.O., about an incident with defendant in the family home when M.O. was about 15 years old.

¶ 6     At the June 2019 bench trial, Craig Salisbury, a licensed therapist, testified that he met with C.O. in December 2016 because she was having sleep problems, which are usually a sign of depression or anxiety. C.O. was 17 at the time. C.O. scored high on a depression skill test, and he screened her for abuse or neglect. C.O. told Salisbury that she had been sexually abused. C.O.'s parents were brought in so that Salisbury could help facilitate C.O. in telling her parents about the abuse. Salisbury advised the family to call the police.

¶ 7     Dr. Raymond Davis, a pediatrician and child-abuse-pediatric physician, testified as an expert. Davis evaluated C.O., who told him that defendant sexually abused her from approximately 6 or 7 years of age until she was 12 and that there had been sexual penetration. She told Davis that the incidents occurred "many times when they were on the couch and sometimes in her bedroom." She said that "[m]ost often the family wasn't there, the parents weren't there, or [M.O] was in the shower." Davis stated that C.O. did not give "real specifics" about the contact other than that there was penetration. He said that he typically did not "go into great detail like a forensic interview would do in those situations." No sexual assault kit was obtained because of the time-lapse

between C.O.'s last reported assault and the evaluation. C.O.'s sexual assault examination was essentially normal. Davis stated that the sleep issues C.O. suffered from could be related to the abuse, but he noted that he was not a qualified psychiatrist. He recommended that C.O. continue counseling and perhaps obtain a referral for an evaluation of post-traumatic stress. On cross-examination, Davis acknowledged that he had noted in his written report that C.O.'s sleep issues were "not related to events." He clarified that, by "events," he meant C.O.'s disclosure of the abuse and his examination of her.

¶ 8    C.O. testified that she was born on January 14, 1999, and she was 20 years old at the time of trial. She lived in Carpentersville, Illinois, with her parents. C.O. testified that, when she was young, she lived at the same location with her mother, Maria; her father, Maurilio; M.O.; and defendant, who was known as "Chikin." Defendant moved into their home when she was very young and lived in the bedroom between C.O.'s bedroom that she shared with M.O. and her parents' bedroom.

¶ 9    C.O. testified about an incident, when she was six or seven, where defendant made her feel uncomfortable. She stated that she was on the couch in the living room when defendant came up to her, took off both of their pants, and put his penis in her vagina. She said that defendant had to crouch down and that she was facing away from the couch while he was standing toward the couch. The incident ended when he took out his penis and C.O. saw "sperm" come out onto the couch. She testified that defendant was nervous when that happened, and he cleaned it up. She said that the incident caused her pain. The incident occurred "[m]aybe in the middle of the day" when no one else was in the room. She did not remember who was in the house at the time, where her family was, if defendant said anything, or what she was doing when he came into the room.

¶ 10    C.O. initially testified that such an incident occurred more than once but that it happened on the couch only one time. The other incidents occurred in her bedroom. However, she later testified that a second incident happened on the couch and that this incident was like the first. C.O. said that she was sitting on the couch when defendant came up, took off both of their pants, and put his penis inside her vagina. No one else was in the living room, but C.O. was not certain if anyone else was at home.

¶ 11    C.O. testified to additional incidents that occurred in the bedroom that she shared with M.O., who was five or six years older than her. The sisters shared a bunk bed, and C.O. said that she would invariably sleep on the top bunk and M.O. would sleep on the bottom bunk. The siblings went to different schools, and M.O. would get up much earlier than C.O., who would continue sleeping while M.O. was in the shower. M.O.'s showers normally took about 45 minutes to an hour. C.O.'s parents would also be sleeping during that time with their door closed and would not wake up until around the time that M.O. was done with her shower. C.O. testified that, on some mornings when her sister would begin to shower, defendant would come into her room and begin touching her vagina both over and under her clothes while she was sleeping. C.O. testified that she was approximately aged 9 when the incidents began and that they continued until she was around 11 (*i.e.*, around 2010), when defendant moved out of the house. Defendant could hear when the water in the bathroom stopped running because it was right next to the bedroom, and he would stop touching her and leave when the water stopped. Defendant did not touch any part of her body other than her vagina, and she could not see him doing anything else with his free hand. C.O. said that she did not tell anyone at the time because she was young and "didn't really know what was going on." She also was embarrassed and afraid to report it to anyone. C.O. said that,

in December 2016 when she reported the incidents to Salisbury, she did not know defendant's whereabouts or whether he had a job. She did not report the matter for money or attention.

¶ 12    On cross-examination, C.O. said that defendant never threatened her or told her not to tell anyone about what happened. She did not remember if she told a detective that defendant never touched her under her clothing. She also conceded that she did not remember specifics as to when the events occurred, such as if they happened on a weekday or a weekend, and she did not know what time of year they occurred. She also admitted that her testimony was different than her statement to a detective that her mother was in the shower, her sister was at school, and her father was at work during the incidents. C.O. also acknowledged during cross-examination that she told a detective that she had been having trouble sleeping and that she wanted to go to college after high school. When she reported the incidents, she wanted to go to the Art Institute to study cinematography and was concerned about her grades and finances affecting her ability to get into the school. She never did get into the Art Institute. However, she claimed that her concern about getting into the Art Institute was not causing her sleepless nights.

¶ 13    M.O. described defendant as a distant relative who lived with the family when she was younger. He moved out when M.O. was approximately 16 years old, or around 2010. M.O. said that generally she would sleep on the top bunk and C.O. would sleep on the bottom but that they would rotate if M.O. fell asleep on the bottom bunk, which happened "[l]ess than half" or "close to half" of the time. M.O. usually got up around 6 a.m. to get ready for school. At that time, her father would already be at work and her mother would still be sleeping.

¶ 14    For the State's propensity evidence, M.O. testified about an incident with defendant that occurred when she was about 15 years old. Her parents had left to run an errand, and defendant was in the kitchen area watching a movie. He told her to look at the TV to see what he was

watching. There was a couch along the wall nearest the kitchen, but the couch was "a little bit forward" toward the TV, so that one could pass behind the couch. She stood up behind the couch to look at the TV. Defendant then came and stood behind her, and the only parts of their bodies that were touching were his pelvis area and her butt. As he stood behind her, she felt that his penis was hard. M.O. did not react to him standing behind her, because she was scared. The incident lasted about two minutes and ended when she pulled away. Defendant then sat back down. M.O. did not tell anyone about this incident because she "didn't think it would be taken seriously or [she] was just ashamed and scared."

¶ 15    C.O's mother, Maria, testified that defendant rented a room in the home for about 10 years. She and Maurilio slept in the bedroom farthest from the bathroom, C.O. and M.O. used the bedroom closest to the bathroom, and defendant lived in the bedroom in between. Maria was shown current photos of the living room, which depicted couches. She claimed that, from 2005 to 2010, the couches were arranged differently, with one against a window and another against the opposite wall. There was not a couch against the wall nearest to the kitchen.

¶ 16    Maria stated that M.O. would normally shower early in the morning. While M.O. was showering, Maurilio would "be going to work" or she and Maurilio would be sleeping in their bedroom. She never observed defendant "around" C.O. from 2005 to 2010, and they did not interact very often. When asked if there were ever times where defendant would be alone with C.O., Maria initially answered no. However, she did not remember if there were times when she would leave the house and C.O. might still be there. She also said that there might have been times when defendant was alone in the house with C.O. When asked to clarify, she said "I don't remember. Maybe once I went to the store, but I would not leave them alone." When asked if there was ever a time that she would take a shower while both defendant and C.O. were in the

house, she answered, "Yes." Defendant's room had direct access to the outdoors and he had a television in the room. Thus, he would have to enter the living space only to use the restroom and the kitchen. He was able to come and go from the house without Maria or Maurilio knowing if he was there. Asked if defendant was welcome at family celebrations, Maria answered that she could "really only remember that time," and she identified a photo showing defendant at a Christmas celebration with the family. She then said that defendant sometimes joined other family celebrations. He lived with the family until about a week before his wedding.

¶ 17 Maurilio testified that defendant was a distant relation but "like a nephew of [his]." Defendant was "part of the family." Maurilio and defendant worked together at a landscape and maintenance company but in different areas, and defendant left for work later than Maurilio. They also worked together in snow removal. There were times during the winter, up to a month or two, when defendant would be unemployed. Maurilio agreed that defendant could come and go from the house without him knowing about it.

¶ 18 The defense called police sergeant Adil Acevedo as a witness. Acevedo spoke with C.O. about her allegations against defendant. He asked her if her body reacted "in a certain way" when defendant put his penis in her vagina, and she replied that she could not remember. Later in his testimony, he clarified that his question was referring to whether C.O. felt pain when defendant placed his penis in her vagina, although Acevedo admitted that he did not use the word "pain" with her. He also testified that C.O. told him that, when this incident occurred, her mother was in the shower and M.O. and her father were not home. C.O. said that the incident did not last very long because defendant "was trying to be sneaky about it so [her] parents wouldn't notice." C.O. told Acevedo that defendant would only touch her over her clothes in the bunk bed because he could

not get her clothes off. However, Acevedo did not recall specifically asking C.O. about skin-to-skin contact.

¶ 19    The trial court found defendant guilty on one count of predatory criminal sexual assault of a child. The court stated that it gave the propensity evidence from M.O. little to no weight. The court then noted discrepancies in C.O.'s testimony but found that she was credible and that the State proved beyond a reasonable doubt that one incident of penetration occurred. The court did not find, however, that a second incident occurred, and commented that C.O. may have confusedly separated one incident into two.

¶ 20    The court also found insufficient evidence of aggravated criminal sexual abuse, as it was unclear whether defendant had skin-to-skin contact with C.O.'s genitals or just touched her over her clothing.

¶ 21    Defendant moved for a new trial, arguing that, due to inconsistencies in the testimony, the evidence was insufficient to prove him guilty beyond a reasonable doubt. That motion was denied, defendant was sentenced to six years' incarceration, and he appeals.

¶ 22                              II. ANALYSIS

¶ 23    Defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. He argues that there were inconsistencies in the evidence and that there was no evidence corroborating C.O.'s testimony.

¶ 24    An accused commits predatory criminal sexual assault of a child if he commits an act of sexual penetration with a victim who is under 13 years of age and the accused is age 17 or over. 720 ILCS 5/11-1.40(a)(1). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 25 The trier of fact has the responsibility to assess the credibility of the witnesses, weigh their testimony, and draw reasonable inferences from the evidence. *People v. Heard*, 187 Ill. 2d 36, 84 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant. *People v. Morehead*, 45 Ill. 2d 326, 329-30 (1970). A reviewing court will not reverse a conviction simply because the evidence is contradictory. *People v. Berland*, 74 Ill. 2d 286, 306 (1978). Nor will a court reverse simply because the defendant claims that a witness was not credible. *People v. Evans*, 209 Ill. 2d 194, 211-12 (2004); *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). We will not substitute our judgment for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000); *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000).

¶ 26 Here, defendant's attack on the sufficiency of the evidence is essentially an attack on C.O.'s credibility. Defendant initially argues that C.O.'s testimony was neither corroborated nor clear and convincing. However, our supreme court has rejected the requirement that a sex-crime victim's testimony be clear and convincing or substantially corroborated. *People v. Schott*, 145 Ill. 2d 188, 202 (1991). Instead, "criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.* at 203.

¶ 27 Arguing that reasonable doubt existed, defendant points to inconsistencies in the testimony such as where C.O. slept, how close defendant was with the family, the position of the couches in the living room, and whether defendant was ever alone with C.O. Not all such inconsistencies,

however, had any bearing on the offense of which defendant was convicted. Defendant was convicted of an incident of sexual penetration occurring in the living room but was acquitted of the incidents occurring in the bedroom. The bunk arrangements of the sisters were collateral to the allegations concerning the sexual assault in the living room. Similarly inconsequential were the minor discrepancies in the testimony concerning defendant's presence at holiday functions. While defendant correctly notes that Maria testified that she did not normally leave defendant and C.O. alone together, she also testified that she might have showered while both defendant and C.O. were in the house and that there might have been times when defendant was alone with C.O. in the house. Thus, it was plausible to conclude that defendant had an opportunity to assault C.O. Meanwhile, M.O. provided testimony tending to show that defendant had a propensity to commit sexual abuse in the living room. The fact that Maria and M.O. may have had conflicting recollections of where the couches in the living room were positioned in the past did not eliminate the value of this evidence. Nonetheless, for unspecified reasons, the trial court accorded the evidence little or no weight. However, we agree with the trial court that there was sufficient evidence of guilt apart from the propensity evidence.

¶ 28    Most importantly, the trial court specifically found C.O. credible despite discrepancies in the testimony. The record shows no motive for C.O. to lie. Defendant argues that C.O. fabricated the allegations so that she would appear more sympathetic in making her reports of sleep disturbances, depression, or anxiety. Defendant suggests that C.O.'s issues were due not to past abuse but concerns about her future. The record does not support that claim. C.O. specifically testified that she did not report the matter to get attention, and Davis stated that the sleep issues C.O. suffered from could be related to the abuse, although he was not a qualified psychiatrist. He clarified that his written statement that C.O.'s issues were unrelated to "events" meant that her

issues were not related to her disclosure of abuse or his examination of her. The trial court, having heard and seen the witnesses, was in the best position to weigh discrepancies in the testimony. Given the deferential role of appellate review, we will not reassess C.O.'s credibility. In our view, the inconsistencies in the evidence were not severe enough to render the evidence so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt.

¶ 29                                III. CONCLUSION

¶ 30    Defendant was found guilty beyond a reasonable doubt. Accordingly, we affirm the judgment of the circuit court of Kane County.

¶ 31    Affirmed.